Before SAMUEL, SCHOTT and BEER, JJ.
BEER, Judge:
Keith Svaboda and Dana Kemp sued Ogden Moville, Jr., his employer, Santa Fe Engineering and Construction Company, and its insurer, Stonewall Insurance Company, Inc., for damages resulting from a vehicular collision on September 19, 1974. Trial on the merits resulted in judgment in favor of the plaintiffs, and defendants sus-pensively appeal. Appellants challenge the trial judge’s decision regarding liability and quantum. Svaboda and Kemp have not appealed, nor have they filed answer to the appeal.
On the date of the accident, at approximately 12:30 p. m., Svaboda, with Kemp as his guest passenger, was driving his motorcycle in a direction away from the river on St. Joseph Street, a two-way street in New Orleans. As they entered the controlled intersection of St. Joseph at St. Charles Avenue, the collision ensued with plaintiff’s motorcycle striking the left front side of an automobile owned by Sante Fe Engineering and Construction Company and being driven by Ogden Moville, Jr., in an uptown direction on St. Charles Avenue in the right hand lane. Moville was accompanied by his wife and mother, all of whom occupied the front seat of the car.
The plaintiffs, Svaboda and Kemp, testified at the trial that the traffic light was green in favor of traffic on St. Joseph Street just before the moment of impact.[1] However, Ogden Moville, Jr., his wife and his mother all testified to the contrary: that the light favored the St. Charles Avenue traffic. Roger Ford, a claims adjuster by profession and the only completely disinterested witness to the accident, testified that he was traveling on St. Joseph Street “about a half or two-thirds of a block behind them (plaintiffs) for a couple of blocks.” As the plaintiffs approached the St. Charles Avenue intersection, Ford noted that the semaphore traffic light indicated green in favor of St. Joseph traffic. When he realized the imminence of the accident, he instinctively (as a trained accident claims adjuster) “looked back at the light” which he testified remained green for the plaintiffs. Immediately after impact, as Ford called over a Citizens Band Radio for assistance, he observed “the light was still green at that time.” On cross-examination, Ford admitted that he could not see the traffic light color indicated for St. Charles Avenue traffic at the time of the accident.
The trial judge, in written reasons for judgment, gave much weight to the testimony of Ford, whose testimony “seemed believable and sound.” We find no manifest error in the trial judge’s credibility call.
Appellants urge that plaintiffs failed to prove their case, contending that there is no evidence that Moville ran a red light. However, in our view, the plaintiffs’ burden of proof is not so onerous as, to disallow the method of deductive reasoning obviously exercised by the trier of fact.
Turning to the quantum issue, we note that several days after the accident, Svaboda was examined by Dr. Philip P. *893 LaNasa, who diagnosed his injuries as cervical sprain; contusion, abrasion, right arm; low back sprain; contusion, right hip; contusion, right calf; sprain, left knee; contusion, ecchymosis, left hip: and abrasion, infection, left leg. (Exh. P-3.)
Svaboda is a marine engineer, and belongs to a union. Shipping companies routinely advise the union of their manning needs for licensed engineers. These jobs were posted at the union hall and members with numbered “shipping cards” bid to acquire a particular job. The longer a shipping card is held unused, the lower that card number becomes, thus increasing the holder’s chances of securing a particular job. At the time of the accident, Svaboda had not shipped out for 9 months. The last union job Svaboda held prior to the accident ended in January, 1974. Thus, as of that date, he began to accumulate seniority such that by the time of the accident, he was in an excellent position to successfully bid for any job then offered.
On September 23, 1974, four days after the accident in question, a desirable assignment became available aboard the vessel SAM HOUSTON. It was filled by one A. Roch, who earned $35,412.01 in the course of that voyage. Svaboda wished to but was unable to take this assignment because he was “still hurting from the accident” although he had seniority over Roch as far as choice of jobs was concerned. A handwritten note from Dr. LaNasa dated October 6, 1975, indicates that Svaboda “was advised not to work because of his injuries.” (Exh. P-5.) Nevertheless, if not for the accident, Svaboda testified that he would have taken the job aboard the S.S. SAM HOUSTON as a permanent “watch standing” third assistant engineer because of “more pay” and “better chance of getting chief engineer.” Svaboda explained that he did not take a job assignment aboard the GREEN VALLEY on September 5, 1974, nor on September 16, 1974, because he “didn’t want to work for that company” even though the wages and duties would have been essentially the same as those aboard the S.S. SAM HOUSTON. On redirect examination, Svaboda clarified that he knew the S.S. SAM HOUSTON “was going to crew up in the next several weeks” after the GREEN VALLEY job was made available.
On October 4, 1974, Svaboda relinquished his seniority status and accepted employment as third assistant engineer aboard the MASON LYKES for financial reasons, even though he felt that he had not fully recuperated from the accident. His job, as a third assistant engineer, required “minimal physical effort” relative to his previous first assistant engineering. After Svaboda’s employment aboard the MASON LYKES, he transferred to the ULTRA SEA and after-wards to the DELTA MAR until May 29, 1975. From then until June 23, 1975, he was on vacation, at which time he worked a non-union job aboard the CAPTAIN FRANCOIS LECLERQ for Euro-Pirates International for 18 days at $70 per day. Svaboda had not worked since then up to the date of the trial on October 9,1975. At the trial, Svaboda testified that he was physically capable of working. This testimony was corroborated by the stipulated medical report of Dr. LaNasa, dated April 4, 1975, indicating that “he (Svaboda) seemed to have made a good recovery from all his injuries. However, he has a resultant scar on his left leg.” (Exh. P-4.)
On the basis of this evidence, the trial court awarded damages as follows:
Medical expenses $ 155.00
Property damage 536.31
Loss of wages 14,155.40
Pain and suffering:
cervical sprain, injury to right arm, low back sprain, right hip contusion, right calf contusion, left knee sprain, left hip contusion and ecchymosis, left leg abrasion, infection and small scar 5.000.00
$19,846.71.
Regarding the loss of wages, the trial judge reasoned that:
“. . . Keith Svaboda would have obtained employment on the S/S SAM HOUSTON had he not been injured. The job actually went to A. Roch, who earned $35,412.01. During this period of employment, Keith Svaboda earned $21,256.61. *894 The difference between these figures represent what the Court feels is a reasonable method of arriving at an amount which will compensate Keith Svaboda for his loss of wages. . . . The Court does not feel an award of future loss of wages is warranted because they are of a speculative nature.”
We find this method of determination of the alleged wage loss and the conclusions with respect to the other items of damages to be supported by the record.
Accordingly, the judgment in favor of plaintiff, Keith Svaboda, is affirmed.[2]
Before SAMUEL, GULOTTA, SCHOTT, MORIAL and BEER, JJ.
SCHOTT, Judge:
Dana Kemp incurred an open laceration of the knee joint in the accident of September 20 necessitating immediate hospitalization and treatment at Charity Hospital. She was taken to surgery where the knee was irrigated and then closed. A splint was applied. She was transferred to Touro Hospital under the care of Dr. Kenneth N. Adatto, an orthopedic surgeon, and she was discharged from the hospital on crutches on September 26.
Plaintiff testified as follows: Although she was heavily sedated during her hospitalization she, nevertheless, experienced much pain and discomfort. During her stay at Touro the pain associated with her knee injuries significantly intensified. She used crutches as an out-patient and described her greatest difficulty as being her physical immobilization compounded by pain. With no elevator going to her third story apartment, she experienced difficulties ascending and descending the staircase. In order to develop ambulatory skills, she received physical therapy at Touro twice a week. In order to further rejuvenate the physical strength of her body she participated in exercise classes and yoga up to and including the day of the trial, but improvement was minimal in her opinion. This accident was disruptive for her in that it occurred when she was at the crossroads of her life between a teaching career and photography, writing and production of educational films. Since the accident she has been tired, exhausted and depressed, her activities have been interrupted, she talks incessantly and the level of her development has fallen back by three years with respect to her connections, traveling and friends. Her knee had progressively gotten better up to a point but she was still having difficulty at the time of the trial one year after the accident. Just one month and a half prior to the trial she knocked her knee on the edge of a table with the result that she “just crumbled to the floor in pain so bad and couldn’t breathe for about half a minute and aching very badly several hours and sore several days.” She went back to Dr. Adatto in July (seven months since she had last seen him and three months before trial) because her knee was painful, numb, and very sensitive and sore to touch. She was embarrassed because of a scar left on her knee from the accident. Nevertheless, she had returned to teaching on December 16, 1974, and was still teaching at the time of trial. A friend corroborated plaintiffs testimony regarding her emotional and physical conditions after the accident and their negative effect on her social and professional activities.
The dance and yoga instructor testified that plaintiff tried very hard to recover by means of exercises which were taken with great difficulty. However, the instructor thought the exercise had notably improved plaintiff’s knee condition.
Dr. Adatto testified that he and his associate treated plaintiff from her admittance to Touro Hospital on September 19, 1974, *895 until her initial discharge from their supervision on January 17, 1975. On July 2, 1975, plaintiff returned to him complaining about her knee. On examination, he found a small nodule mass on the inside of her knee which he diagnosed as a cystic medial meniscus. He stated that this condition “gives the person trouble” and while such a nodule frequently flattens on its own it “might flare up off and on.” He said the condition could be treated and cured surgically at an estimated cost of $2,000 but it would be better for the patient to live with it. He was asked when he would expect plaintiff to have an onset of degenerative arthritis and he replied: “She might get it at the age of 45 or 50, or as opposed to somebody 60 or 70. No way to predict it. When people have something wrong with the joint traumatically or surgically the changes are increased they will have trouble later on.” He gave her a permanent disability rating of 15% consisting of 10% for increased chances of arthritis and 5% for the cystic medial meniscus.
Dr. Robert J. Meade, a plastic surgeon, examined plaintiff’s scar on March 3, 1975, and noted the dimensions of the scar to be 2 inches long and Vi inch at the widest. He advised that the appearance of the scars can be improved with surgery estimated to cost $400.
The trial judge itemized his award as follows:
Medical Expenses $225.00
Hospital Expenses $707.50
Drugs $8.76
Cost of future cosmetic surgery $400.00
Lost Wages $2,880.00
Pain and Suffering:
contusion to right hip, injury to right knee resulting in scarring and a 15% permanent disability, future pain and suffering $40.000,00 $44,221.26
At least one of the issues present in the instant case, and universally present in all suits in which plaintiff is seeking compensatory damages for mental anguish, pain and suffering, is the factual question as to whether plaintiff told the truth on the witness stand or whether her testimony was designed to mislead and deceive the trial judge into thinking that the effect of the injuries was worse than it actually was. From a reading of this plaintiff’s testimony, it seems clear that she exaggerated and dramatized her complaints for the purpose, of influencing the trial court to make a generous award, but he had the opportunity to observe this plaintiff in person and evidently believed her. Under the prevailing jurisprudence of the Supreme Court we cannot say that the trial judge abused his “much discretion” under LSA-C.C. Art. 1934(3) in making this generous award. Coco v. Winston Industries, 341 So.2d 332 (La., 1977).
Accordingly, the judgment in favor of Dana Kemp is likewise affirmed.
SAMUEL and BEER, JJ., DISSENT FROM AFFIRMING THE JUDGMENT IN FAVOR OF DANA KEMP.

. After the accident, Svaboda checked the operation of the traffic light facing St. Charles Avenue traffic, and, after two sequences of green, yellow and green, he concluded that the light was properly functioning.

. The original panel of the court was unanimous in affirming the judgment in favor of Keith Svaboda, but Judge Schott dissented from a proposed judgment which would have reduced the amount of the judgment in favor of Dana Kemp. Hence, pursuant to LSA-Const. Art. 5, Sec. 8(B), the case was reargued before a panel of five, consisting of the original panel and Judges Gulotta and Morial. Since the added panelists agreed with Judge Schott, he became the author of the majority opinion insofar as it applied to the judgment in favor of Dana Kemp.