341 So.2d 332 (1976)
Gary James COCO
v.
WINSTON INDUSTRIES, INC., et al.
No. 57969.
Supreme Court of Louisiana.
December 13, 1976.
Dissenting Opinion January 12, 1977.
Rehearing Denied January 21, 1977.
*333 Gerard F. Thomas, Jr., Natchitoches, Sidney E. Cook, Cook, Clark, Egan, Yancey & King, Shreveport, for plaintiff-applicant.
Breard Snellings, Trial Atty., Jack M. Alltmont, Sessions, Fishman, Rosenson, Snellings & Boisfontaine, New Orleans, for defendant-respondent.
CALOGERO, Justice.
We granted a writ of certiorari in this personal injury damage suit to review the judgment of the Court of Appeal reducing substantially a significant jury award.
Plaintiff, a general laborer then twenty years old, was injured while operating an unguarded dado saw at Sherwood Homes, Inc. where he was employed in the business of constructing mobile homes. After a six-day trial, a civil jury returned a verdict in favor of plaintiff for $350,000.00, subject to a stipulated credit of $23,147.32 comprising workmen's compensation benefits earlier received by plaintiff.
Originally a three-judge panel of the Court of Appeal affirmed the quantum award. A rehearing was granted and thereafter a five-judge panel in the Court of Appeal reduced the award to $140,000, subject to the compensation credit. One *334 judge concurred only to the extent of reducing the award to $200,000. Another judge dissented, believing that the judgment of the district court as affirmed on original hearing should have been reinstated.
We granted review (La., 332 So.2d 864) upon plaintiff's complaint that the drastic reduction violated Civil Code Article 1934(3) and the principles announced in Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Ballard v. National Indemnity Company of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967); and restated in a number of cases since, including these: Anderson v. Welding Testing Laboratory, Inc., 304 So.2d 351 (La.1974); Bitoun v. Landry, 302 So.2d 278 (La.1974); Revon v. American Guarantee & Liability Ins. Co., 296 So.2d 257 (La.1974); Spillers v. Montgomery Ward & Co., 294 So.2d 803 (La.1974); Boutte v. Hargrove, 290 So.2d 319 (La.1974); Fox v. State Farm Mutual Automobile Ins. Co., 288 So.2d 42 (La.1973); Walker v. Champion, 288 So.2d 44 (La.1973); and Miller v. Thomas, 258 La. 285, 246 So.2d 16 (1971).
In the foregoing cases we have repeatedly referred to the Article 1934(3) assertion that in the assessment of damages in cases of offenses, quasi offenses and quasi contracts, "much discretion must be left to the judge or jury."
And we have asserted, initially in Miller v. Thomas, supra at p. 19 that
"From these decisions, two principles emerge: (1) To modify the amount of an award for general damages, an appellate court must find that the trial judge or jury has abused the `much discretion' accorded by the codal provision; (2) The awards in other cases serve only as an aid in determining whether there has been an abuse of discretion and rivet no steel frame of uniformity."
Recitation of the principles governing the legal issue presents no problem for our appellate courts. It is the application of those principles to particular cases which has proved difficult on occasion. Two questions are especially troublesome. What, in a given case, constitutes an acceptable quantum judgment in the sense of its being neither excessive nor inadequate within the framework of the legally-directed "much discretion" accorded judge or jury? When do awards in other possibly similar, reported cases properly aid (or erroneously mislead) an appellate court in determining whether there has been an abuse of discretion by a given judge or jury?
The appellate court is aided in answering these questions by such later expressions of this Court as these:
"Unless the record demonstrates that the trial court abused the `much discretion' provided for in fixing damages (C.C.1934), the appellate court should not disturb the award. . . . The question is not whether a different award might have been more appropriate, but whether the award of the trial court can be reasonably supported by the evidence and justifiable inferences from the evidence before it. That such evidence might also support a greater (or smaller) award will not justify a change in the amount by the appellate court." Bitoun v. Landry, supra at 279.
"A reviewing court might well disagree with the amount of the award fixed by the jury, but it is not entitled to substitute its opinion for that of the trier of fact." Spillers v. Montgomery Ward & Company, Inc., supra at 809.
"The reduction [must be] supported by the record." Walker v. Champion, supra at 46.
"The awards made in other cases provide no scale of uniformity; their use is limited to serving as an aid to determine, if the present award is greatly disproportionate to similar awards (if truly similar), whether an issue of abuse of discretion may exist in the present case. In any event, an abuse of trial-court discretion must be clearly demonstrated by the record before an appellate court will tamper with an award of general damages." Anderson v. Welding Testing Laboratory, Inc., supra at 352.

*335 "Adequacy or inadequacy of an award should be determined by the facts and circumstances peculiar to the case under consideration." Boutte v. Hargrove, supra at 321-22.
Nonetheless, the ultimate determination by an appellate court as to whether a given judge or jury abused their "much discretion" as a matter of law is a judgment call, a fact which, of course, explains why on rehearing in this case, of the five judges only three (and even one of the three had been of the contrary view on original hearing) concluded that $140,000 rather than $350,000 was the legally acceptable quantum judgment and why three members of this Court have dissented to this very opinion.
Further complicating the already difficult problem is that this Court is constantly acting on writ applications alleging error by appeal courts in judgments applying the principle of Article 1934(3). In its opinion, the Third Circuit Court of Appeal discussed many of the cases wherein this Court denied writs of certiorari following an adjustment in the quantum by a Court of Appeal, and it concluded from such study that this Court does not intend to take from the lower courts the right to review quantum awards made at the trial level. The Court of Appeal's conclusion that this Court intends for the appellate courts to continue to review quantum awards, is correct[1] as is shown by all of the cases previously cited, as well as by our recent decisions in Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975) and Temple v. Liberty Mutual Ins. Co., 330 So.2d 891 (La. 1976), wherein we reaffirmed the constitutional authority of appellate courts to review and render quantum awards. We are here concerned with the character of that review.
Realistically, in quantum issues, as in other issues, there must necessarily be a degree of uncertainty in predicting the ultimate result in a given case. Results will differ principally because of the myriad differences in the cases presented for review. And, of course, there will continue to be honest disagreement among appellate judges when they attempt to determine whether the "much discretion" of Article 1934(3) has been abused in the trial court, and when they attempt to seek aid by looking to other possibly-comparable decided cases. Focusing an informed judgment tempered by a fair recognition of the discretion vested in the trial judge or jury (see the Chief Justice's comment in Miller v. Thomas, supra) is no simple task resulting in uniform result among judges engaged in appellate review.
We do reemphasize, however, that before a Court of Appeal can disturb an award made by a trial court that the record must clearly reveal that the trier of fact abused its discretion in making its award. Anderson v. Welding Testing Laboratory, Inc., supra; Bitoun v. Landry, supra; Fox v. State Farm Mutual Automobile Ins. Co., supra; Walker v. Champion, supra. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court. Bitoun v. Landry, supra; Spillers v. Montgomery Ward & Company, Inc., supra. It is never appropriate for a Court of Appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence.
Further we believe that, heretofore, courts of appeal have placed too much emphasis on their review of other reported decisions. Certainly no two cases are ever fully alike. And whether two cases are so similar as to produce like quantum judgments is hardly discernible by gleaning the facts of the comparable decision from simply a written opinion of an appellate tribunal. Of course, another factor bearing on this matter is that significant change has been, and is taking place in our society not *336 the least of which are changes in economic conditions (particularly rampant inflation), fluctuating job categories, employment opportunities, and even lifestyles. Furthermore, it is impossible for an appellate court to judge what evidence in a particular case was given special weight by the finder of fact.
These preliminary observations behind us, we proceed to examine the case under consideration in order to determine whether the Court of Appeal was wrong in finding as they did that the jury in this case abused the much discretion accorded it by law.
The following portion of the opinion of the Court of Appeal on original hearing in our view fairly describes certain of the facts pertinent to the case at hand:
"It was plaintiff's dominant right hand that was cut. He lost all four of the fingers proper and most of the palm. What remained of his hand was the thumb and that part of the palm attributable to it and to the index finger. The thumb was rotated surgically to give some grasping function between the thumb and the remainder of the hand. Pictures in evidence show the affected member to present a freakish appearance.
"The accident occurred April 9, 1970. Plaintiff was hospitalized for eight days immediately following the accident. To effect a skin graft, his hand was attached to the abdomen for about three weeks. He then returned to the hospital for detachment of the hand and remained about six days. In July, he returned to the hospital for three days for the surgery of turning the thumb. During all this time and until his last office visit to the doctor on September 22, 1970, plaintiff had seen the doctor periodically.
"At the time of the accident, plaintiff was 20 years old and had completed the eleventh grade four years before. During those four years, he had held several manual laboring jobs. He was earning the minimum wage while working for Sherwood. He did not work after the accident until 1972 when he attended a rehabilitation school and thereafter went to work as mechanic. In April, 1974, he went to work for Brake-O, a concern which specialized in servicing front ends, brakes and shock absorbers. For nine months during 1974 he earned approximately $9,000 at that work. A few weeks before trial, he was transferred from Brake-O's central shop in Dallas to another shop in Arlington, Texas. The Brake-0 firm specialized in quick servicing of the needed mechanical work. The evidence shows that plaintiff was transferred to the Arlington, Texas, shop because of his inability to render the fast service required at the main Dallas shop.
"Plaintiff introduced the deposition of Mr. Albert Tamaz who was service manager at Brake-O's central shop in Dallas. He testified that plaintiff was a good worker but was substantially restricted by his handicap. Plaintiff was paid on a piecework basis."

* * * * * *
"The only medical testimony was that of Dr. David Henry who had not treated plaintiff but evaluated him shortly before the trial. He described generally the condition of plaintiff's hand, noted a decrease in flexion of the wrist because of scar tissue and the skin graft, observed that the abnormal functioning of the joints had shown some arthritic changes and thought that plaintiff would suffer increasing impairment over the years because of the arthritis. He noted that plaintiff's hand was of no value for fine movements or precise functions and fixed a 60 to 70 percent loss of function of the hand and a 35 to 40 percent impairment of plaintiff as a total human being in all fields of human endeavor.
"Plaintiff presented Dr. David Townsend, a professor of finance and economics at Northwestern State University as an expert in the field of economics and finance. This expert proceeded to calculate the present value of plaintiff's loss of earnings over the next 45 years with an assumption that his present annual loss of earnings was $5,000. He discussed economic *337 history generally and explained the various factors involved in determining the real purchasing power of the dollar and the extent to which it is affected by changing conditions over the years. He also considered such things as rate of increase in wages as compared to price increases, variations in interest rates, plaintiff's restricted opportunities in a competitive labor market and other similar factors. Without going into any specific statistics regarding the past history which he used to project the future economic developments, he stated that a discount should not be applied because it would be offset by the other mentioned factors. He computed the present value of plaintiff's future loss of wages at $225,000 by multiplying $5,000 (the assumed annual wage loss) by 45 (the number of years of life expectancy left to plaintiff)." 330 So.2d 649, 665-66.
In his testimony Mr. Thomza, plaintiff's boss, made several statements concerning the amount of diminished earning capacity plaintiff suffered at his job in comparison with the earnings of other mechanics. He said that because of his partial hand loss plaintiff was less productive in his work. A fair assessment of that testimony is that mechanics who compare favorably with plaintiff in competence and drive, but with two good hands, were earning on the commission piece work anywhere from three thousand to eight thousand dollars annually more than plaintiff.
Photographs in the record reveal that plaintiff's injury is grossly disfiguring. Testimony indicates he is ashamed and humiliated by the grotesque appearance of his lobster claw right hand. It is a source of mental trauma to him. Plaintiff who is right handed is handicapped to accomplish such simple things as buttoning up the front of his shirt. He cannot button his left shirt sleeve nor left jacket sleeve; he cannot remove anything from either of his right hand pockets, side or rear, with his right hand; he cannot tie a tie; he cannot tie his shoe laces except with great difficulty; he cannot use a knife and fork nor other eating utensils except with difficulty; he cannot wash his face or brush his teeth except in an awkward manner; he cannot pick up a pencil or a coin off of a table with his right extremity; and use of hand tools is something he accomplishes only with extreme effort and difficulty.
Three of the five members of the Court of Appeal concluded on rehearing that the highest award which could be allowed in this case for general damages is the sum of $75,000, and that $65,000 is sufficient to compensate him for loss of earnings. These sums made up the $140,000 to which the Court of Appeal reduced this plaintiff's award.
We have thoroughly reviewed this record and desist from speculating what part each of the major items (general damages and loss of wages) played in the total award of $350,000.
As indicated in the Court of Appeal's recitation of facts (which we have adopted hereinabove) and our assessment of other pertinent evidence, to which we have alluded at various parts of this opinion, plaintiff's virtually complete loss of his right hand was disabling to an extreme degree with debilitating physical and mental consequences; and his loss of past and future earnings was for not less than forty-five years, and except earnings for two or three years immediately succeeding his injury, was not less than $5,000 annually. Whatever the composition of the jury award, we conclude from a review of this record that the jury did not abuse its much discretion in concluding that plaintiff was due for his injury the total sum of $350,000.
Able counsel for defendant has vigorously though unsuccessfully argued the merit of the Court of Appeal reduction and the propriety of that court's application of the legal principles governing appellate review of trial court quantum awards. We will attempt to answer certain of his specific complaints.
Defendant contends that no more than $61,017.28 was proven by plaintiff to be his loss of future earnings. He argues that the jury probably allowed $225,000 for *338 loss of earnings on the strength of argument by plaintiff's attorney and testimony by plaintiff's economist. The economist, Dr. David Townsend, testified that if plaintiff's annual loss of earnings was $5,000, and if the length of time was forty-five years, the loss would come to $225,000. He did not discount this sum because in his view a pre-payment discount would be fully offset by certain other factors, including rate of increase of wages in keeping with price increases, variations in interest rates, and plaintiff's restricted opportunity in a competitive labor market. Defendant asserts that the proven annual loss was $2500 rather than $5,000, that the period of loss (to age sixty-five) was forty-one years rather than forty-five years and that at best, according to Dr. Townsend's own testimony, a proper interest discount would be two and one half to three percent, in light of the witness' admission that over the long run interest rates for triple A rated bonds (the safest but lowest yield bonds) exceed the consumer price index (a measure of inflation) by two and one half to three percent. On these assertions (and/or assumptions) counsel argues that the gross future earnings loss should thus have been discounted at an annual rate of at least two and onehalf to three percent net. On these assertedly "proven" facts defendant presents a computation which indicates that $61,017.28 is sufficient to fund a $2500 per year annuity during plaintiff's expected work life.
Although defendant's argument is a persuasive one if we accept his initial premises, he oversimplifies the import of the economist's testimony, disregards the witness' consideration of plaintiff's restricted opportunity in a competitive labor market, and assumes factual bases which might have been, but apparently were not found by the jury. It is clear to us that the evidence was sufficient to warrant significantly different conclusions on the part of the trial jury. For these reasons we are unimpressed with defendant's otherwise plausible computations.
Defendant had argued in the Court of Appeal, and inferentially does so again in this Court, that a plaintiff earning $2400 annually at the time of an injury who asserts a minimum $5,000 annual earnings loss at the time of trial, from a newly-found occupation, may not use this basis because prohibited by the rules requiring minimization of damages (plaintiff cannot by choosing his particular trade increase his loss of earnings). In support of this argument defendant cites this language from Viator v. Gilbert, 253 La. 81, 216 So.2d 821, 822 (1968):
". . . work of a reasonable character, that is, work for which he was fitted by training and experience of the same or similar kind in which he was engaged at the time of the accident."
But the full indemnification to which an injured party is entitled under Article 2315 (Jordan v. Travelers Insurance Co., 257 La. 995, 245 So.2d 151 (1971)) includes damages for decreased earning capacity which is determined by deducting plaintiff's earning ability after the injury from his earning ability immediately prior to the injury rather than by deducting his income after the injury from his income prior to the injury. The Court of Appeal on original hearing emphatically rejected defendant's argument and said:
"Wages at time of injury are usually suggestive of the individual's future earnings. This is not an absolute unvarying rule. In many instances, changes in work and increase of earnings would be more probable. The law does not destine an injured party to his situation at the time of injury. It would be unrealistic and unjust to accept defendant's argument. In Edwards v. Sims, 294 So.2d 611 (La.App., 4th Cir. 1974) it was said:
". . . Moreover, loss of wages can properly be computed on the amount the plaintiff would in reasonable probability have been earning at time of trial, although he was earning less at the time of the accident. James v. State, 154 So.2d 497 (La.App., 4th Cir. 1963)." 330 So.2d at 666.
We believe that the foregoing passage from the Court of Appeal opinion on original *339 hearing properly applies the governing legal principles.
For the foregoing reasons the judgment of the Court of Appeal is set aside and the quantum judgment of the district court reinstated. Accordingly there is herewith decreed judgment in favor of plaintiff Gary James Coco, against Universal Underwriters Insurance Company in the sum of $350,000 together with legal interest thereon from date of judicial demand until paid, and all costs of these proceedings including expert witness fees fixed by the district court, subject to a credit against the above judgment in the sum of $23,147.32, being the total sum of workmen's compensation benefits paid to the plaintiff.
SANDERS, C.J., dissents in part and assigns written reasons.
SUMMERS, J., dissents for the reasons assigned by the Court of Appeal.
MARCUS, J., dissents and assigns reasons.
MARCUS, Justice (dissenting).
I am of the opinion that the court of appeal correctly reduced the award from the sum of $350,000.00 to the sum of $140,000.00. Accordingly, I respectfully dissent.
SANDERS, Chief Justice (dissenting).
In Miller v. Thomas, 258 La. 285, 246 So.2d 16 (1971), this Court summarized the jurisprudence relating to the appellate review of general damages as follows:
"From these decisions, two principles emerge: (1) To modify the amount of an award for general damages, an appellate court must find that the trial judge or jury has abused the `much discretion' accorded by the codal provision; (2) The awards in other cases serve only as an aid in determining whether there has been an abuse of discretion and rivet no steel frame of uniformity.
"Applying these principles to a personal injury award often presents real difficulty. The facts relating to the injuries must be collated in each case. Upon these facts, the Court must focus an informed judgment, tempered by a fair recognition of the discretion vested in the trial judge or jury."
Plaintiff's injury consisted of the loss of four fingers and part of the palm of his right hand. The medical procedure and residual effect are described in the majority opinion.
The Court of Appeal, applying the above principles of appellate review, concluded that the jury had abused its discretion in awarding $350,000. It reduced the award to $140,000. The Court of Appeal noted that the trial judge had failed to review the award, because of his erroneous opinion that he was prohibited from doing so.
As the record reflects, I did not join in the granting of the writ, being of the opinion that the Court of Appeal had committed no error of law in its judgment. Unquestionably, the Court of Appeal applied the principles of review announced in the decisions of this Court. Moreover, I noted that the trial judge had not reviewed the award in accordance with our normal procedures.
After further consideration, I agree with the Court of Appeal that the jury abused its discretion in awarding $350,000. The award is equivalent to an income of over $26,000 per year for the remainder of plaintiff's life. An award of this magnitude is clearly unwarranted. Louisiana law allows no punitive damages. Our consideration, therefore, is restricted to compensatory damages only. Plaintiff is not totally disabled and is regularly employed. He has received no medical attention since shortly after the accident. He suffers no pain and leads a relatively normal life. Giving the plaintiff a liberal appraisal of his injury, I would fix the award at $200,000.
For the reasons assigned, I respectfully dissent.
NOTES
[1] At the same time, it is worth noting that writ denials by this Court are of no value as precedents. Barham, The Importance of Writ Denial, 21 Loy.L.Rev. 835 (1975).