COVINGTON, Judge.
This suit arises out of a sand-dune buggy accident which occurred in or near Winchester Bay, Oregon, on June 14, 1973. Both plaintiffs and defendants were residents of Covington, St. Tammany Parish, Louisiana, at the time. Suit was brought by the plaintiffs in the Twenty-second Judicial District Court for the Parish of St. Tammany on April 30,1974. Originally joined as defendants were Albert E. Hazelquist, State Farm Mutual Automobile Insurance Company (State Farm), as the insurer of Albert E. Hazelquist, and Allstate Insurance Company (Allstate), the uninsured motorist carrier of the plaintiffs, Martha Ann Wagner and Gary L. Wagner. On June 13, 1974, by supplemental and amending petition, St. Paul Fire and Marine Insurance Company (St. Paul) and Howard Rondeau, the latter being a resident of the State of Oregon and the owner of the vehicle involved in the accident, were named as parties defendant. *1266 Also, in the supplemental petition the plaintiffs alleged that Allstate was contractually obligated to pay their medical expenses, alleged that the company had arbitrarily refused to pay their claim, and asked for statutory penalties and attorney’s fees. Thereafter, declinatory exceptions and motions were filed on behalf of St. Paul and Rondeau, objecting to the jurisdiction of the court over Rondeau and also attacking the right of a direct action against St. Paul by the plaintiffs, Martha Ann Wagner and Gary L. Wagner. These exceptions and motions were disposed of by the trial court, and this aspect of the case is not now at issue before this Court.
Subsequently, by third party demand, defendants, Albert E. Hazelquist and State Farm, joined as a party defendant St. Paul, alleging in general that St. Paul afforded primary coverage to Hazelquist as the driver of the vehicle, which was owned by Ron-deau, St. Paul’s insured. Similar pleadings were also filed by Allstate, but it was eventually dismissed voluntarily by the plaintiffs, so that this issue also is no longer before the court. Safeco Insurance Company was later named as an insurer, but it was also dismissed from the suit. An answer by St. Paul was filed to the third party demand which, in effect, denied that it afforded coverage to Hazelquist, the driver of Rondeau’s vehicle, on the basis that he was driving the vehicle without permission of the insured.
Thus, as of the time of trial on May 11, 1976, the issues in this case had been narrowed, by the various exceptions, motions, pleadings and dismissals, to the following questions: whether Hazelquist was negligent in his operation of the Rondeau vehicle; whether the plaintiffs, Mr. and Mrs. Wagner, were contributorily negligent; the quantum, if any; and whether the policy of insurance issued by State Farm or the policy issued by St. Paul covered the driving of Hazelquist.
Following the trial, the matter was held open pending the filing of certain depositions pertaining to the coverage question which were to be taken in the states of Oregon and Washington. Upon the filing of these depositions, the case was considered as submitted, trial briefs were filed and, on September 10, 1976, for written reasons assigned, the trial judge rendered judgment in favor of the plaintiffs, Mr. and Mrs. Wagner, finding that Hazelquist was negligent in his operation of the vehicle. The trial judge further found that the policy of insurance issued by St. Paul afforded coverage to Hazelquist, and was primary to the policy issued by State Farm. The trial judge awarded Mrs. Wagner the sum of $30,000.00 in general damages and awarded Mr. Wagner $3,984.00 for medical expenses incurred on behalf of his wife. The judge also awarded Mr. Wagner the sum of $1,500.00 for his general damages, together with medical expenses of $122.00. The judgment was signed in this matter on October 1, 1976.
There followed a substitution of counsel. Then, a motion and order for suspensive and, in the alternative, devolutive appeal was filed on behalf of Albert E. Hazelquist, State Farm, and St. Paul. These steps were taken because coverage and defense as between State Farm and St. Paul is no longer at issue. The suspensive appeal was perfected. No appeal has been taken from that portion of the judgment holding St. Paul to be the primary carrier. The limits of liability under the State Farm policy are $100,000 per person, $300,000 per accident. The judgment of the trial court was in favor of the plaintiffs and against Hazel-quist and his insurer, State Farm; further, judgment was rendered in the same amount, plus all costs, in favor of State Farm and in its third-party demand against St. Paul. Its policy limits are $50,000 per person and $100,000 per accident. Thus, presented for review by this Court are the questions of the liability of Albert E. Hazel-quist and quantum.
The Wagners and the Hazelquists, very good friends and neighbors in Covington, had agreed to meet in Reedsport, Oregon, for a few days of fishing and sightseeing before flying on to Hawaii for a further vacation together. The Hazelquists had *1267 preceded the Wagners so that they might visit with some friends, Bill and Beverly Miller. The Wagners arrived there on June 13. That evening the Wagners, the Hazel-quists, and the Millers dined together. During the course of the evening, it was suggested that they all go riding the next day on the sand dunes located near Reeds-port. The Wagners had not seen the dunes before; the Millers and Hazelquists thought that they would enjoy the scenic beauty of the dunes.
Arrangements were made to borrow a 1969 Willis Jeep which was owned by Howard Rondeau, who was a friend of Miller, and who also had known Hazelquist when the latter lived in Oregon. The vehicle was specially equipped for excursions on the sand dunes, e. g.; it had four wheel drive, low pressure tires, and a roll bar. The trip to the dunes took place on the afternoon of June 14, 1973.
Bill Miller and the Wagners picked up the Rondeau jeep that afternoon and met the Hazelquists and Beverly Miller at the dunes. The couples agreed that the Hazel-quists and the Wagners should take the first ride. Albert Hazelquist was selected to drive the jeep because he had lived in this area several years before, had owned a jeep similar to the Rondeau jeep, and had driven on the dunes on numerous occasions. Marilyn Hazelquist rode on the passenger side of the front seat, Gary Wagner in the left rear seat, and Martha Ann Wagner in the right rear seat. Neither Mr. nor Mrs. Wagner had ever ridden on the sand dunes; therefore, neither knew what to expect.
Before the two couples proceeded on to the dunes, Bill Miller stuck his head inside the jeep to remind Marilyn Hazelquist to buckle her seat belt. When Martha Ann Wagner asked where her seat belt was, Bill Miller replied, “Honey, you just hang on,” indicating that there was no seat belt.
Prom this point, the Wagners’ and the Hazelquists’ versions of what happened concerning the incidents just prior to the accident are somewhat in disagreement; however, they do not differ substantially as to how the accident happened. The Wagners testified that Hazelquist drove the jeep onto the sand a short distance and was apparently testing its handling ability. They proceeded over one dune and started up another one, but the jeep was not able to make it up this dune because of insufficient speed. According to the Wagners, Hazel-quist then backed it down the incline and told them that he would increase his speed for a second attempt. As the jeep reached the crest of the dune, traveling at a speed of 10 to 15 miles per hour, its front wheels went into a depression or hole which was not visible to any of the parties until the jeep went over the crest. Mrs. Wagner was leaning forward at the time, with her head extended over the back of the front seat. When the front wheels of the jeep went into the hole, it caused the Wagners to be thrown up and down resulting in the injuries complained of in this suit.
The Hazelquists’ version as to how the accident occurred is slightly different, but not materially divergent. Mr. Hazelquist testified that when he first drove on to the sand dunes, he wanted to make sure the jeep was a safe vehicle. In order to familiarize himself with its handling and its power, he drove up a long, gradual incline to test the power of the jeep. When the jeep bogged down, he felt he knew its power, so he proceeded to come back down off the incline. Then he drove along the base of the dunes, attempting to follow the tracks of dune buggies that had been out there earlier. As they were driving along, they came to the top of one of the small mounds that are found frequently on the dunes. When they came to the top of the mound, he saw that there was a drop-off on the other side, so he told the others to “hang-on.” Mr. Hazelquist also testified that he noticed nothing unusual in the way the jeep came down on the other side of the mound and that he continued on for a distance of from thirty to fifty feet before noticing that the Wagners had been injured.
The primary issue involved in this case is whether the manner in which the defendant, Hazelquist, was driving the Rondeau jeep constitutes actionable negligence on his *1268 part. The defendants do not deny that Hazelquist owed to his passengers a duty of reasonable care in driving on the sand dunes. However, the question again is whether the manner in which he was driving the dune buggy amounts to a breach of that duty of reasonable care, so as to render him and his insurer liable to the plaintiffs.
We have examined carefully the testimony of each of the parties in describing the accident.
The testimony of Martha Ann Wagner included:
“Q. Well, then describe how the Jeep proceeded onto the dunes and what you did.
A. After Bill left the Jeep, we started to go through the dunes up to the dunes through the sand and we spun as you will do with the back end kind of swinging around once and then taking the wheel and going around this way with the back end, and we proceeded over one incline, or crest, or dune, whatever you want to refer to it as, and started to go up another one, which we weren’t able to make, and we backed off again because in going up, the wheels apparently went down into the sand, or whatever happened, and we backed down the incline and this is where A1 said, ‘Well, let’s get a little more speed and we can make it over the hill.’ So this is where we started up again with more rate of speed and as we hit the top and we started up a little faster, this is when I leaned up behind Marilyn or where I could see out the front window. Gary actually, I believe, was leaning back because you could not see out any of the side windows and I was looking out over the front, and as we went over the incline, A1 at that time said, ‘Watch out,’ and simultaneously as he said, ‘Watch out,’ we hit a hole and the wheels of the Jeep, the front wheels of the Jeep fell down into the hole and bounced up and first we were going up and then going down over and this is when I flew up to the top of the Jeep, came down on, hitting the top of the roll-bar because of leaning up and looking at the window, hitting the roll-bar and coming back down and around the back of each of the front seats is a tubular piece of metal, and I came down, and this is where I hit the impact of my mouth and cut it from here up and then down and the pieces of my lip was hanging down here.
“Q. As you were proceeding along in the Jeep up the dune that you have described, were you on any particular road or path?
A. No, not that I am aware of.
Q. You could not see out the side?
A. No, definitely not.
Q. And you could see forward only by leaning as you did?
A. Yes, by leaning up and looking out the front windshield.
Q. Were you attempting to hold yourself in place?
A. Yes, I had actually taken a hold on the side of the Jeep and the back of Al’s seat when I was looking up as we started up over because I wanted to see where I was going, and that’s when I, when we hit the hole and I came down, I was right there where the impact was on.
Q. But you were holding on?
A. Yes, I was holding.
Q. Even at that time?
A. Yes, sir, and as we hit the hole, A1 said, ‘My God, oh my God,’ and I remember putting my head down ■ there, of course, all of the blood, I had white pants on at the time and Marilyn put her arm around me to hold me forward. I kept wanting to lean backwards and she was holding me forward and I feel if I would have gone back, I would have probably passed out completely, but by her holding me forward with my head down, I did not pass out completely.
*1269 Q. Now, when you entered this Jeep to go on the dunes, had you ever had any idea of the nature of the ride on the dunes?
A. No, this was something that was new to me and I had never been on the dunes previously, didn’t know what dunes were.
Q. You had never lived around them?
A. No, sir.
Q. You had never ridden on them before?
A. No, sir.”
With reference to speed, Mrs. Wagner testified on direct examination:
“Q. Can you estimate the speed that you were going the second time when you tried to make it.
A. I would say fifteen to twenty. Because you just . . . .”
Gary L. Wagner described the accident as follows:
“Q. Describe how the trip ensued on the dunes after Mr. Hazelquist became the driver, tell the court how the trip went.
A. We actually were when we originally pulled into the area on the parking lot, I think we were right out on the edge of the area where you drive into the dunes. We were right there. I think I recall we took off to the left and started driving. We were gone, I’d have to guesstimate how far, maybe fifty or a hundred yards. A1 did swerve the wheels was, I guess, what anyone would do, bringing it back and forth is another thing you obviously do when you get on the sand dunes, because it is very easy to slide on sand. We proceeded over either one dune or around the edge of a dune and went over and down, came over another area, and I believe we came again and angled left, can’t recall exactly, was a fairly steep incline going up and guesstimate twenty five percent, just have to estimate how—
Q. It wasn’t very steep?
A. I don’t think it was very steep, no. We couldn’t make it up the hill. We weren't going fast enough. I recall there were some tracks going different directions. I don’t know — we did not follow those tracks. They went some other direction. It was not a road, possibly where a previous dune had gone, sand buggy or something. We were three-fourths of the way up the incline and couldn’t make it, don’t recall how we backed down, and Al’s comment at that time also was very vague, that there was something stated about this time we make it. We went up and, as I recall, we had just gotten to the crest of the top of the dune and it was like I would imagine dropping off another edge, because I do remember him saying something about watch out at that very moment, the front end of the Jeep dropped into something and I tried to reach, I do recall trying to reach Ann. She had been sitting a little forward of me up here and I was still back enjoying myself really, and the next thing I recall is seeing her bleeding and I couldn’t see out of my left eye. I reached up and, of course, my hand was full of blood at the time.”
With respect to speed, Mr. Wagner testified:
“Q. And what at that time the Jeep dropped off or fell in the hole, approximately what was the speed of the vehicle?
A. Since we were either just right at the crest of the hill or were going over the hill, we certainly couldn’t have been going too fast, because it took some effort to get up to that area. I’d say fifteen miles an hour at the most.”
Albert E. Hazelquist described the accident as follows:
“Q. As you went onto the dunes and began to drive, you made a maneu *1270 ver or two with the vehicle. Would you describe to the court what maneuver you made. How was it done?
A. Yes. I don’t specifically remember those particular maneuvers. What I was concerned with was we left the parking lot area through a short approach road to a flat area in front of the dunes. My first concern was to familiarize myself with the Jeep to make sure it was stable and sound, that I was familiar with its handling characteristics and that I was confident it was a safe machine. So I drove out this small access road and then continued ahead and wanted to see how much power and how this Jeep behaved and went up this kind of a long, gradual incline to see how much power we had, and continued to do that until the Jeep bogged down. Then I knew its capabilities and made a swing and came back down off the hill.
Q. Did you cross a hill—
A. No.
Q. Before you had the accident?
A. No, I went up this lone incline and until the car stopped and then I turned and came back down the hill. In my mind I knew the characteristics of the Jeep, felt confident in its stability, and then came back down off that long incline and came at the base of this flat area that follows along the base of the dunes and there was some tracks of other dune buggies before us and we were kind of motoring along in this flat area where these tracks were, and as the wind sometimes does, it will blow these dunes kind of up into a little mound, and this is when we were continuing along and I came up, we came up to the top of one of these small mounds. When we came up to the top of it, I could see that there was going to be a decline on the other side of it, so I said, ‘Hang on,’ and we went over that mound and came down and it wasn’t unusual to me, the characteristics of that particular situation weren’t unusual and I continued to drive, and I must have gone thirty to fifty feet when I heard Ann in the back seat and when I turned around and saw the tragedy that happened, I just stopped the Jeep and said, ‘Oh, my God, we’ve got to do something.’ Marilyn turned around and saw the situation. Ann was in pain and mentioned that her back was hurting and she wanted to get out of there right away. I waited just a few more seconds to see how Gary was and he was bleeding from a cut up here, but it looked like a superficial kind of a cut and so we just turned the Jeep and slowly went out the same access road that we had come in on and stopped the car by the stationwag-on.
Q. You didn’t see anything unusual about the way you went over the tip?
A. No, I really didn’t. I really didn’t. That’s why I continued to drive for another thirty to fifty feet.
Q. How fast were you going as you went over the tip?
A. It was level ground for all purposes up until that time, so I would estimate ten to fifteen miles an hour, closer to ten.”
Mr. Hazelquist testified further:
“Q. You were going to drive it over and around these crests.
A. That’s right.
Q. The use of the power is necessary because you are sometime on an angle, on the side of a dune, is that why you need power?
A. No, it’s not. I guess I don’t quite understand the question.
Q. You said you were testing it out to see what power it had for the purpose of making these crests, is that right?
*1271 A. Yes.
Q. You stated that you were surprised when you came over the crest and you had this unusual, I suppose, dip, is that right?
A. Those kind of drop offs are, you know, quite prevalent.
Q. Quite prevalent. So you should have expected that at the top of the hill, the top of the crest?
A. You keep your eyes open for them and when you see them, you say hang on or whatever.
Q. But you are on top before you can see how much of a dip?
A. Well, by on top, I don’t mean right on top. It’s out here, you know, a short distance from the car.”
* * * * * *
‘Q. So at that point you could not see over the tip, you just proceeded over the tip without stopping?
A. No, well, yes I saw the dip and cautioned them and we proceeded to go over it because it wasn’t, you know, it didn’t .
Q. You didn’t stop, you just went right over it and you said hold on or something?
A. I said, ‘Hang on.’ And then proceeded at what I considered to be a safe motoring speed.
Q. There was a considerable dip and a considerable jar as a result of that?
A. But it wasn’t out of the ordinary and I just continued to drive.
Q. You didn’t slow down as you approached the top and you didn’t stop as you crossed the top, is that right?
A. Well, we were going, I felt we were going so slow anyway this was kind of a speed that we would motor with.
Q. But at the point as you approached this tip, you could not tell the severity of the dip on the other side?
A. Well, we were in an area where at the base of these dunes . . . you don’t have real severe, you know, six and eight foot drop offs and these kind of things that you can encounter way back in the dunes.”
The trial judge stated:
“The Court finds that the accident was the sole result of negligence on the part of Hazelquist. He simply drove the vehicle into a depression or mound (hole) which caused enough impact to injure the parties in the rear seat who had no way to secure themselves other than to hold on.
“Additionally, the Court finds no contributory negligence nor any assumption of risk on the part of the Wagners. They had no means of securing themselves except by holding on, and the impact that occurred was too great for this to be sufficient. Also the Wagners, to the knowledge of the other parties, had not been on the dunes and did not know what to expect. The impact that did occur was apparently unexpected even to Hazel-quist since his testimony is that they were basically riding to enjoy the view rather than test the vehicle. “Consequently, there was no reason for them to expect a jolt of the violence that occurred.”
We agree. We have reviewed the record and it amply supports the trial judge’s findings. See Dyson v. Gulf Modular Corp., 388 So.2d 1385 (La.1976).
The parties have been unable to discover any Louisiana cases involving the operation of dune buggies, and our independent research has uncovered none. The appellant suggests that the situation in the instant case is analogous to cases involving automobiles confronted by hidden obstructions or hazards in a public highway. We believe that there is more of a similarity between the instant case and cases involving terrain-traversing vehicles, such as snowmobiles, rather than road-traveling vehicles.
Our research reveals two snowmobile cases that are helpful in resolving the liability question in the instant case. They assist us in supporting the holding of the trial court.
*1272 The first is Ujifusa v. National Housewares, Inc., 24 Utah 2d 219, 469 P.2d 7 (1970), where the plaintiff had been riding as a passenger behind the driver on a snowmobile driven by an executive officer of the defendant company, for whom the plaintiff was working as a commercial photographer. He was injured as the snowmobile catapulted into the air and landed some distance away. The accident occurred at a ski resort near Salt Lake City, Utah. The facts were that in ascending a hill, the snowmobile was driven around a mogul (a man-made snowbank); but, in descending, the driver, instead of bypassing the mogul, drove over it and was catapulted in the air about 10 or 12 feet. In landing, the driver was thrown upward and to the rear and on top of the plaintiff, causing him to strike his back against a vertical backrest, injuring his back. The plaintiff had never ridden a snowmobile, he had no previous warning of the jump over the mogul and, being seated behind the driver, he could not see the mogul and had no opportunity to take any preventive action. In remarking on the jury’s finding for the plaintiff, the court considered that the recited facts reflected that there was evidence to support a finding of negligence. Relative to contributory negligence, the court observed that the jury did not choose to find for the defendant on this question although the court had given a proper instruction on this question. On the question of assumption of risk, the court said:
“It does not appear that there were any circumstances so obvious and knowledgeable to a person like the plaintiff here as to reflect a hazard that would lead a reasonable person to protect himself against a likely injury.”
The second case is Olson v. Hansen, 299 Minn. 39, 216 N.W.2d 124 (1974), where there was an action arising out of a snowmobile accident resulting in injuries to the plaintiff passenger when the snowmobile rolled over on her. The accident occurred on Big Island in Lake Minnetonka. The plaintiff was a passenger on a snowmobile with the defendant. They were out sightseeing on the island in the company of another snowmobiling party. Before the accident, the plaintiff had only briefly been on a snowmobile, while the defendant had considerable experience with those vehicles. The defendant, being aware of her inexperience, had previously given her instructions on holding on and leaning into turns. He had exclusive control in the election of the path they traversed. They were following the other snowmobiling party, but had lost sight of them. As defendant’s snowmobile traversed a hillside, the defendant realized the hill was too steep because the vehicle showed a tendency to roll. Thereupon, he assumed a semi-standing position to stabilize it and he cautioned the plaintiff to lean with him. As he leaned into the hill, she also leaned in that direction. Suddenly, the vehicle tipped to the right and rolled downhill. The defendant was thrown from the snowmobile and the plaintiff attempted to throw herself clear of the vehicle but it landed partly on her right leg. The court found the defendant to be negligent and the plaintiff not to be contributory negligent. The court also specifically found that the plaintiff had not assumed the risk since she had no knowledge of the danger being encountered, either through prior experience or warning by the defendant.
The appellants also complain that the awards made by the trial court to the plaintiffs were excessive. The only basis for appellants’ contention that the awards, particularly to Mrs. Wagner, are excessive, is that appellants cite six cases in which the range of awards was from $10,000.00 to $22,000.00. We would have thought that Anderson v. Welding Testing Laboratory, Inc., 304 So.2d 351 (La.1974), and now Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), had permanently disabused any appealing parties of the idea that “similar” injuries necessitates “similar” awards. Anderson and Coco dictate, without the use of sesquipedalian words, that other reported decisions on quantum serve merely the limited purpose of indicating whether an issue of abuse may exist due to a disproportion-ateness in the awards; similar cases provide no “scale of uniformity.”
*1273 The trial judge, in his reasons, detailed the nature of Mrs. Wagner’s injuries, the type of treatment that she underwent, the residual effect, and other factors that went to make up his award, as follows:
“The remaining question is quantum. Gary Wagner suffered a laceration to the left front forehead and back pain. He had medical expenses of $122.00 including $61.00 for his broken glasses. The Court finds that he will be adequately compensated by a judgment in his favor for pain and suffering in the amount of $1500.00 plus special damages of $122.00.
“Mrs. Wagner was given emergency treatment at the hospital in Reedsport and then hospitalized. On June 15, she was allowed to fly home under restrictive conditions where she was immediately seen by her family doctor Dr. Keller. He reviewed x-rays taken in Oregon and found that Mrs. Wagner had a minimal fracture of T-12, L-l vertebra. She has additional bruise type injuries to the right arm. He treated her conservatively by the use of steroids and physical therapy from June 16, 1973 through February of 1974 for her back. Medical for these injuries amounted to $176.00.
“The more immediate problem was to Mrs. Wagner’s face particularly in the area of her mouth. She had suffered considerable damage to her teeth and her family dentist, Dr. Beatty, was able to get her into his office on Sunday, June 16. He found that both maxillary lateral incisors were fractured above the gingiva so there was nerve exposure on each. Additionally, the maxillary right central incisor, the left central incisor and the mandibular right cuspid were fractured. “Dr. Beatty first put on a temporary crown merely to relieve pain and cover the exposed nerve. On June 28, 1973, he referred Mrs. Wagner to an oral surgeon who removed the two lower teeth. Two temporary teeth were put in until healing could take place.
“On July 16, he removed the front four teeth on top and inserted a partial plate for healing. In October of 1973, he made a permanent lower bridge and in November of 1973 he made a permanent upper bridge. The dental charges were $1525.00.
“Dr. Gertrude Waite, a plastic surgeon saw Mrs. Wagner in June of 1973 for the tissue damage to her face. She found that Mrs. Wagner had a pitted scar, mid-upper lip, a displaced septum with partial destruction of nasal airway on the right. “In September of 1973, she did a sub-mucous resection which involved removing some bone and cartilege (sic) of the nose. This procedure was performed in the hospital under local anesthesia.
“On March 1, 1974, she excised and revised the scar on the lip, and on October 7,1974, she performed a second procedure to this same area. Her charge was $940.00 and the results were excellent. “The total of special damages incurred by Mrs. Wagner, including medical, amounts to $3,984.10. Mr. Wagner is entitled to judgment in this amount in addition to the amounts awarded him above for his own injuries. Mrs. Wagner will be adequately compensated by an award in her behalf for general damages in the amount of $30,000.00.”
The plaintiffs-appellees, in their brief, correctly set out the injuries to Martha Ann Wagner, and their impact, as follows:
“Ann Wagner suffered the following injuries: A crushing excoriation of the upper lip, pain lumbar spine and fracture T-12 and L-l, Flexion compression fracture of superior anterior surface and two broken upper lateral incisors.
“These injuries resulted in months of dental treatment, facial surgery and was complicated by the discomfort of her back, along with the necessary the prolonged periods of sitting in the dentist chair. The dental and surgical procedures were described in detail by Drs. Waite and Beatty. Dr. Beatty testified that x-rays were made which revealed that both maxillary lateral incisors were fractured about four millimeters above the gingiva with nerve exposures on both teeth. The Maxillary right central inci *1274 sor had the incisal angle fractured while the left central incisor was fractured on the root. It was also noted that the mandibular right cuspid was fractured. Only palliative treatment was given at the inception due to other injuries sustained by Mrs. Wagner. Because of her back injury she was unable to withstand long dental treatment periods. The initial treatment consisted of occlusal adjustments and temporary crowns over the exposed nerves.
“Because of the nature of the injuries sustained by the involved teeth, Dr. Beatty stated, it was necessary to extract the mandibular right lateral incisor and cuspid. This was done at Dr. Beatty’s request by an oral surgeon. The maxillary lateral and central incisors were extracted in his office. In both cases, the extracted teeth were replaced with acrylic partíais while healing took place. Dr. Beatty’s charges from June 16, 1973 to November 26, 1973, were $1,595.00.
“Dr. Gerald C. Keller testified that Mrs. Wagner sustained several injuries, including a fracture of T-12 and L-l vertebras, a multiple jagged laceration of her upper lip, several broken teeth, and muscular injury of her right arm, and a cervical strain. She was seen at home on the 16th day of June, 1973 and placed on house rest with only minimum activity. She was seen in his office on June 20, 1973 whereby she was still complaining of moderately severe pain in her back, neck and arm. On June 27, 1973, her sutures were removed and it was noted that her back pain was dissolving and she was allowed that activity which would not produce back discomfort. At that time, she was referred to Dr. Gertrude L. Waite, a plastic surgeon, for evaluation of her scar and she was being followed by Dr. Edwin Beatty for care of her teeth injuries. Mrs. Wagner’s back pain, as well as neck pain, continued for a prolonged period. As a matter of fact, Mrs. Wagner suffers with her back in ordinary household chores, standing or sitting for long periods still produces pain in her back. The charges of Drs. Keller and Greggory from June 20, 1973 through September 21, 1973 were $85.00; and from September 23 through February 8, 1974, she incurred an additional $91.00 in expense.
“Dr. Gertrude L. Waite stated that she evaluated Mrs. Wagner for nasal and upper lip deformity and scarring, that Mrs. Wagner had suffered considerably from nosebleed at the time of the accident, and her central upper lip was numb and teeth ached.
“Dr. Waite further stated that there was a pitted scar in the mid-philtrum of the upper lip. There was an inferiorly based flap measuring %" X 5/s" over the lower philtrum, based on the tubercle of the upper lip, extending through the mucocu-taneous junction upward to the pit in the skin just to the right midline xh" below the insertion of the columella. There appeared to be a fracture of the spine of maxilla displaced to the left, resulting in a cartilaginous septal deformity with displacement of the anterior septum and partial obstruction of the nasal airway on the left side, with some depression of the nasal tip and deviation of the tip to the left.
“On August 27, 1973, Mrs. Wagner was re-evaluated and it was determined that her surgical repair would be done in two stages; namely, (1) reconstruction of the nasal tip and septum; and (2), excision and revision of the scars of the lip. Dr. Waite’s fee for consultation of June 29, 1973 was $15.00.
“On September 24, 1973, a submucous resection and nasal tip reconstruction were done at St. Tammany Parish Hospital in Covington, Louisiana. Her surgery fee for this procedure was $450.00. The charges for St. Tammany Parish Hospital were $541.70 for this confinement.
“On March 1, 1974, Dr. Waite performed an excision and revision of scars of the lip, for which her surgical fee was $350.00. The charges of St. Tammany Parish Hospital were $318.00.
“Relative to the surgery for revision of her upper lip done on March 1, 1974, *1275 there was a small area of hypertrophic scarring along the margin to the right of the tubercle. This small residual deformity could further be improved by a revision of this area. This revision was performed on October 7, 1974. Dr. Waite’s fee for this surgery was $125.00.
“The outline of the prolonged personal, financial and medical involvement of Mrs. Wagner as a result of' the severe facial injuries suffered in the accident along with the spine fractures as defined, is to demonstrate injuries for the purpose of evaluation of the damages due Mrs. Wagner.”
******
“It is recalled that Mrs. Wagner stated that she was very much upset with the tragedy insofar as it involved her appearance and it is worthy of comment that Mrs. Wagner was an extremely attractive woman who cared fastidiously for her appearance. Thank to Dr. Waite, Dr. Beatty and Dr. Keller, Mrs. Wagner, at the time of trial, is again very attractive. The Plaintiffs’ Exhibits P-1 and P-2 show Mrs. Wagner’s appearance during the period of trauma resulting from the blow to her face and mouth. As these conditions, repair and restructuring of her teeth and face progressed, Mrs. Wagner had great difficulty maintaining her appearance and confidence.
“Beauty is an asset of any individual. Mrs. Wagner testified that she was very much concerned about her appearance and about whether or not her teeth and face would again be representative of her natural advantages. Dr. Waite indicated to the Court the slight defects in Mrs. Wagner’s appearance which are remaining since the surgery was completed and also indicated the area of numbness of the lip which is a permanent defect of which Mrs. Wagner is aware.
“The distinguishing factor concerning the injuries of Ann Wagner is that there were cumulative in effect as to her pain and suffering along with her diligent attempt to recover entailing the foregoing time and involvement. For a good general discussion of an injured plaintiff with similar injuries, involving prolonged dental repairs and facial surgery see: Knotts v. Employees [Employers] Casualty Company, 177 So.2d 630, Court of Appeal Third Circuit, 1965.”
The plaintiffs-appellees also accurately describe Gary Wagner’s injuries as lacerations of his forehead and back pain.
We find no abuse of the much discretion vested in the trier of fact; LSA-C.C. art. 1934(3). Rather, the record substantiates the contentions of the plaintiffs and his awards.
Accordingly, we affirm. the judgment. The costs are to be paid by the defendants-appellants.
AFFIRMED.