474 So.2d 994 (1985)
Leo LEE
v.
GAFFNEY CONSTRUCTION COMPANY, et al.
No. 85-CA-170.
Court of Appeal of Louisiana, Fifth Circuit.
July 29, 1985.
Rehearing Denied September 17, 1985.
Writ Denied November 1, 1985.
*995 Norman Mopsik, New Orleans, for plaintiff-appellee.
Charles R. Capdeville, Metairie, for defendants-appellants.
Before CHEHARDY, CURRAULT and DUFRESNE, JJ.
CHEHARDY, Judge.
Gaffney Construction Company and its worker's compensation insurer, Fidelity and Casualty Company of New York, appeal a judgment finding plaintiff, Leo Lee, totally and permanently disabled by an eye injury he incurred in a scuffle with a fellow employee.
On appeal defendants assert that Lee is ineligible for worker's compensation benefits because his injury is the result of willful misconduct and the intention to injure another; alternatively, that he is not permanently and totally disabled, or even partially disabled, because he has continued to earn a substantial income in his former occupation as a pipefitter-welder.
On June 3, 1980 Leo Lee was a 46-year-old pipefitter-welder working on a job for Gaffney Construction Company at the Shell Oil Refinery in Norco, Louisiana. He and a co-worker, Chester Dykes, began trading insults and shadow-boxing over a pipe they were fitting. Another co-worker, E.J. Weaver, intervened by grabbing Lee, whereupon Lee stumbled and fell, receiving a cut in the eye area. His injury ultimately was diagnosed as a blowout fracture of the *996 bone around the eye socket. The fracture was surgically repaired and healed well; Lee's only residual disability is diplopia (double vision) in the extreme downgaze to the left.
Lee received temporary total disability compensation benefits while he was recuperating from surgery for two months following the accident. The compensation insurer refused to pay further benefits because Lee returned to work and actually has earned more since his accident than before. Lee filed this suit, seeking benefits for permanent total disability.
As written at the time of the accident, LSA-R.S. 23:1081 provided, in pertinent part:
"No compensation shall be allowed for an injury caused (1) by the injured employee's wilful intention to injure himself or to injure another * * *.
"In determining whether or not an employer shall be exempt from and relieved of paying compensation because of injury sustained by an employee for the causes and reasons set forth in this Section, the burden of proof shall be upon the employer."
Defendants contend the scuffle that resulted in plaintiff's injury was a fight, thus was exempted from coverage by the statute. Plaintiff contends, and the trial judge found, the scuffle was simply horseplay. The judge concluded the testimony of plaintiff and two of his former co-workers, Dykes and Nettles, established that Lee and Dykes were engaged in horseplay prior to the accident. Alvin Alonzo, a third co-worker, testified to the contrary, asserting the incident did not look like horseplay but like a fight. The judge concluded,
"However, I must resolve the statements and testimony and find that the incident evidently happened so fast that it would not be fair to characterize the episode as one of a fight. All of the testimony leans toward the `horseplay' argument.
"The testimony of Alonzo, while believable, has certain difficulties. First, the fact that he was in a supervisory role speaks for itself. Also, I am not too sure of what he saw and when he saw it. I think he is definite about the fight, but this fight occurred after the injury. Again, I find the sequence of events transpired as follows:
"Work, horseplay, injury, fight.
* * * * * *
"It ought to be noted that throughout all of the witnesses' testimony, any alleged hostility was after the injury. Before the injury, there was horseplay. Once the injury occurred, the hostility perhaps ensued, but at the point the injury occurred, the claim for workmen's compensation attached."
We find no manifest error in this factual finding. The statute makes clear that it is the employer's burden to prove the employee had a willful intention to injure himself or another. Lee, Dykes and Nettles all testified that Lee and Dykes were just kidding around prior to the injury. Alonzo testified it did not look like horseplay to him; his testimony also differed in some factual particulars. However, the conflicting accounts called for a credibility determination by the trier of fact, which he resolved in favor of plaintiff's version of events. The judge's conclusion was reasonable and supported by the evidence; there is nothing in the record that shows him to be clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978). Accordingly, we affirm his finding that plaintiff is eligible for worker's compensation benefits.
The trial judge was clearly wrong, however, in finding the plaintiff to be permanently totally disabled. At the time of the accident, LSA-R.S. 23:1221 provided, in pertinent part:
"Compensation shall be paid under this Chapter in accordance with the following schedule of payments:
* * * * * *
"(2) For injury producing permanent total disability of an employee to engage in any gainful occupation for wages, whether or not the same or a similar *997 occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee, at the time of the injury, was particularly fitted by reason of education, training and experience, sixty-six and two-thirds per centum of wages during the period of such disability.
"(3) For injury producing partial disability of the employee to perform the duties in which he was customarily engaged when injured or duties of the same or similar character, nature, or description for which he was fitted by education, training, or experience, sixty-six and two-thirds per centum of the difference between the wages the employee was earning at the time of the injury and any lesser wages which the injured employee actually earns in any week thereafter in any gainful occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee, at the time of injury, was particularly fitted by reason of education, training and experience, during the period of disability, but * * * not beyond a maximum of four hundred fifty weeks for such partial disability resulting from injury occurring on and after September 1, 1977; * * *.
"(4) In the following cases, the compensation shall be as follows:
* * * * * *
"(i) For the loss of an eye, sixty-six and two-thirds per centum of wages during one hundred weeks.
* * * * * *
"(o) In all cases involving a permanent partial loss of the use or function of the members mentioned hereinabove, compensation shall bear such proportion to the amounts named herein for the total loss of such members as the disability to such members bears to the total loss of the member, provided that in no case shall compensation for an injury to a member exceed the compensation payable for the loss of such member.
"(p) In cases not falling within any of the provisions already made, * * * where the usefulness of a physical function is seriously permanently impaired, the court may allow such compensation as is reasonable and in proportion to the compensation hereinabove specifically provided in the cases of specific disability, not to exceed sixty-six and two-thirds per centum of wages during one hundred weeks."
Lee returned to work as a pipefitter-welder two months after the accident and has continued to work in that capacity, earning $26,386 in 1980 and $49,047 in 1982. In 1981 his and his wife's joint income was $36,499. Records from the Plumbers & Steamfitters' Local Union No. 60 established he worked 1767 hours in 1980, 1818 hours in 1981, 2390 hours in 1982 and 425 hours in 1983. (The difference between his hours in 1983 and the preceding years was not explained.)
On the other hand, Lee testified he can no longer work in high places, on the advice of his physicians, because of his left-downgaze double vision. He stated he has suffered several on-the-job accidents that he attributes to the double vision, but did not offer details to support that allegation. He also stated that his inability to work in high places limits the jobs available to him as a welder. At the time of trial, he was not working as a welder but in a short-term position doing instrumentation work at an oil refinery, earning $16.80 per hour. He said that because of his eye problem he has to select "a job that won't last too long."
This evidence establishes that Lee clearly does not fit within the definition of permanent total disability because he is able to engage in a gainful occupation for wages. Accordingly, we reverse the district court as to the finding of permanent total disability.
Thus the question to be answered is which of the partial disability categories, if any, plaintiff fits, considering the uncontested *998 fact of his residual disability, the double-vision on his extreme left-downgaze.
Dr. Richard J. Hesse, plaintiff's ophthalmologist, testified he could not assign a percentage of disability resulting from Lee's diplopia. For eye problems, he stated, disability is determined by visual acuity and field of vision, both of which are normal in Lee. He said the amount of disability resulting from double vision, particularly in an extreme-of-gaze position, is very individualistic and relative to what that person tries to do. While any diplopia would permanently and totally disable a professional baseball player, other persons would be able to lead completely normal lives despite it.
Dr. Hesse noted that the diplopia would cause Lee a problem when doing anything at heights from which he is required to look down. Barring assignment to unusual heights and positions, however, Dr. Hesse felt there was no reason why Lee could not continue employment as a welder. Dr. Hesse testified that he had advised Lee to attempt to avoid jobs requiring him to work in high places.
He stated, however, that not all of Lee's problems were attributable solely to the double vision from his injury. He noted that Lee had become presbyopic (farsighted), as many people do in their forties, and had been fitted with bifocal glasses utilizing prisms to partially alleviate the double vision. The difficulty, he said, is that a prism can be designed for a given gaze position but there are still some ranges and gazes for which it cannot compensate. Dr. Hesse remarked that the bifocals, necessary for Lee's near vision, created some significant difficulty for him, as they do for many laborers in occupations involving climbing.
Dr. Sanford Pailet, an opthalmologist, had examined Lee once to render a second opinion on further surgery. He testified he had advised Lee against another operation, feeling it would involve as much risk of further damage to the eye as possibility of alleviating the double vision. He too had advised Lee against working in high places.
Both doctors admitted that Lee could compensate for the double vision in his left downgaze by tilting his head to look down. Dr. Hesse pointed out, however, that most eye motility is unconscious. Thus, one may make a conscious effort to compensate, but still there will be a few seconds in which one inadvertently looks into the field of diplopia and experiences the double vision before adjusting the head to compensate. This could pose a significant risk when working at heights, he remarked.
Considering these facts, we see that plaintiff fits within two categories of R.S. 23:1221subsection (3), partial disability, and subsection (4)(o), permanent partial loss of the function of his left eye. It can be argued that he also falls within category (4)(p), serious permanent impairment of the usefulness of a physical function; however, no award can be made under subsection (4)(p) where either the disability provisions or the specific injury schedule applies. Jack v. Fidelity & Casualty Co. of New York, 326 So.2d 584 (La.App. 3 Cir. 1976).
We conclude this situation is precisely that discussed by the Supreme Court in Jacks v. Banister Pipelines America, 418 So.2d 524 (La.1982):
"Although the employee may not recover compensation for both his specific loss and his permanent partial disability, he is entitled to the more favorable of the two remedies. In a case in which it cannot be predicted which remedy will be more favorable, the employee should be awarded compensation for his specific loss as a minimum with reservation of his right to recover under the partial disability provision in the event it proves to be the more favorable.
* * * * * *
"The Louisiana act establishes a conclusive presumption that victims suffering the losses set forth in the schedule will sooner or later be permanently partially disabled. * * *"
Jacks v. Banister Pipelines America, supra, at 526, 528.
*999 In this case, as in the Jacks case, the injured employee has continued to earn wages equalling or exceeding his prior income:
"In the present case, however, in which the employee continued to earn wages at the same rate despite his partial disability, determination of the more favorable remedy remained problematic at the time of trial. If the employee should become unemployable because of his partial disability, the disability provision offers a greater number of weeks of compensation. On the other hand, if he continues to be able and willing to work, and his wages do not decline, greater compensation is afforded by the specific loss provision. * * * In order to assure that the employee is permitted to recover under whichever provision affords him greater compensation, he should be awarded compensation for the specific loss as a minimum with reservation of his right to recover under the partial disability provision in the event it proves to be the more favorable.
"If the employer is later required to pay the worker compensation for his partial disability, because it proves to be the more favorable remedy, the employer will be entitled to subtract the 100 weeks of compensation paid for the specific loss from the maximum number of weeks for which partial disability compensation is payable. * * *"
Jacks v. Banister Pipelines America, supra, at 528, 529.
Because plaintiff here has continued to earn wages equal to or greater than those he earned prior to his injury, at this time he could recover nothing under subsection (3) of R.S. 23:1221. Accordingly, we must apply subsection (4)(o) and award compensation for his specific loss.
The difficulty in doing this is the lack of a medically-assigned percentage disability for his vision problem. The trial judge considered him 100% disabled, obviously, because he found him permanently totally disabled. As we have discussed, that finding was error. Therefore we take it upon ourselves, considering the evidence, to assign a percentage of loss of eye function. Following the procedure used in Chipman v. Insurance Co. of North America, 389 So.2d 432 (La.App. 2 Cir. 1980), and the implication of Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976), we assign the maximum disability we would affirm in these circumstances, which we find to be 20% of the total function of the eye. Therefore he is entitled to receive 100 weeks of compensation at 20% of $148, or $30 per week. (The maximum allowable rate of compensation at the time of the accident, as stipulated at trial, was $148. See LSA-R.S. 23:1202.)
For the foregoing reasons, the judgment of the district court is reversed insofar as it found plaintiff to be permanently totally disabled. The judgment is amended to award the plaintiff, Leo Lee, 100 weeks of compensation under LSA-R.S. 23:1221(4)(o), at the rate of $30 per week, and 350 weeks of compensation under LSA-R.S. 23:1221(3), subject to a credit for compensation already paid, as provided in LSA-R.S. 23:1223. In all other respects the judgment is affirmed. Costs of this appeal are assessed against defendants, Gaffney Construction Company and Fidelity & Casualty Company of New York.
REVERSED IN PART; AMENDED IN PART; AND AS AMENDED, AFFIRMED.