L. JULIAN SAMUEL, Judge Pro Tem.
Defendants appeal a jury verdict awarding $95,000.00 to plaintiff for injuries she sustained when the chair in which she was seated at the Cafe Maspero restaurant suddenly collapsed, causing her to fall backwards onto the floor. The $95,000.00 is an in globo award; it includes all medical and other expenses. Liability has not been argued or contested. The sole issue on appeal is whether the award is excessive.[1]
Our examination of the record satisfies us that plaintiff has proved with sufficient certainty that she sustained the following expenses:
Medical expenses $1,152.00
Loss of wages 723.00
for a total of $1,875.00. Therefore, we consider the jury’s award for general damages, including pain and suffering, to have been $93,125.00
In determining whether the jury abused its “much discretion” contained in La.C.C. Art. 1934(3), and given to the trier of fact in assessing damages, we follow the guidelines set in Reck v. Stevens, 373 So.2d 498 (La.1979). Therefore, our initial inquiry is directed at determining whether the $93,-125.00 general damage award is appropriate for these particular injuries considering their effect on this particular plaintiff.
Plaintiff was injured on November 22, 1981 at the Cafe Maspero restaurant. According to the plaintiff’s undisputed testimony, she had been seated at a table in the restaurant for a matter of minutes when suddenly, and without warning, her chair collapsed, causing her to fall backwards onto the floor, striking her head, back and *754 shoulders on a nearby table. Plaintiff experienced immediate pain in her head, neck, and back, and although she did not lose consciousness, had to be assisted to her feet. She was driven by her husband and son to the Hotel Dieu Hospital Emergency Room where she was examined and treated by emergency room physicians. X-rays taken at the hospital revealed no fractures. She was given medication for her pain and released shortly thereafter.
Plaintiff testified that she returned home and attempted to treat herself with bed rest and Tylenol. After approximately three weeks, when her pain was no better, she consulted a local orthopedist, Dr. John Watermeier.
Dr. Watermeier testified he first saw plaintiff on December 14, 1981. At that time she complained of increasing pain in her neck, severe headaches, and numbness in both hands. The doctor conducted a physical examination and took x-rays of plaintiffs neck and back. Following this initial examination, he noted she had a slight condition of arthritis in her neck and a generalized mild deterioration of the bone (known as osteoporosis). Dr. Watermeier was of the opinion that the plaintiff’s accident had aggravated this pre-existing condition. He prescribed an analgesic for her pain and gave plaintiff some exercises to do at home.
Dr. Watermeier next saw the plaintiff on January 11, 1982, some four weeks later. At that time, she continued to complain of pain in her neck radiating into her shoulder and of numbness in both hands. Because of the persistence of her symptoms, Dr. Watermeier felt that a diagnostic test was required. Accordingly, plaintiff was referred to Dr. Gerald Burns for the purpose of having an electromyogram (EMG) run. An EMG is a test designed to determine if there is any interference with the nerve conduction in the arms, forearms, and the hands. Dr. Burns, who did not testify at trial, interpreted the EMG as showing evidence of carpal tunnel syndrome.
On January 25, 1982, the occasion of plaintiff's third visit to Dr. Watermeier, he informed her that the EMG showed signs of carpal tunnel syndrome, more evident on the right than on the left side. By definition, carpal tunnel syndrome is a group of symptoms which result from pressure on the median nerve, which runs under the band that holds the bones of the wrist together. Dr. Watermeier initially recommended that plaintiff treat this condition conservatively by immobilizing both wrists with a splint and laying off work. He prescribed pain medication for the wrists, and for plaintiff’s ongoing arthritic condition.
Dr. Watermeier saw the plaintiff on February 3, 1982, and again on February 8, 1982. On both occasions, plaintiff continued to complain of numbness in her hands. Dr. Watermeier, who wanted to continue conservative treatment, again prescribed pain medication. He did, however, advise plaintiff that if her symptoms did not improve, surgery might be indicated.
Plaintiff’s last visit to Dr. Watermeier was on May 28, 1982. At that time, plaintiff complained of numbness and weakness in her right hand. She did not complain of pain associated with her arthritis, which Dr. Watermeier took as an indication of remission of that condition.
On the occasion of this final visit, Dr. Watermeier advised plaintiff that she might require surgery on her right wrist, but felt that she could continue to be treated with medication, daily soaking, and a splint as needed. He did not see plaintiff again.
At the request of counsel for Cafe Maspero, plaintiff consulted Dr. Richard Levy, a local neurosurgeon. Dr. Levy examined plaintiff on June 14, 1983, just one week prior to trial. Dr. Levy testified that at the time of his examination plaintiff complained of pain in the neck going into the head, both shoulders, and the arms, and of pain in the low back going into the legs. She also complained of numbness in all fingers of both hands. Dr. Levy conducted a full neurological examination of plaintiff and then reviewed the medical reports, of *755 fice notes, and x-rays taken by Dr. Water-meier.
Dr. Levy’s examination of plaintiffs neck and back revealed normal curves to the back of the neck and to the low back region. Dr. Levy was unable to detect any objective signs of injury in either region, although he did note that plaintiff complained of pain in the mid-neck and mid-low. back and that plaintiff was unwilling to move her neck to any significant degree in any direction.
Dr. Levy examined the x-rays taken by Dr. Watermeier on December 14, 1981, and testified that those x-rays were surprisingly free of arthritis. He noted minimal arthritic change in plaintiffs neck and evidence of more arthritis in the low back than in the neck but commented that there was still less arthritis than would normally be expected in the average 59 year old woman.
Dr. Levy then tested both of plaintiffs arms and legs for signs of any neurological disease or injury. His examination led him to conclude that the numbness in plaintiffs hands and legs did not follow any known neurological and anatomical distribution, and therefore could not be used as a basis for finding any neurological ailment. Dr. Levy testified: “I found no disability. That is to say I found no spinal cord, nerve root or nerve disease or injury in the arms and legs and I didn’t think any neurosurgery was indicated.” Dr. Levy went on to testify more specifically, that he found no evidence of carpal tunnel syndrome. He explained: “... a carpal tunnel syndrome produces numbness in the palm surface of the thumb, middle finger and one-half of the ring finger as well as numbness on the back surface of the four fingers down to the first joint. This is the way we are built and this is what the median nerve supplies. The numbness I found in this lady was in these (indicating) four fingers, in its [sic] entirety, I didn’t find it in these three and a half, which makes me feel the numbness she had was not in that nerve distribution. ..” Dr. Levy concluded his testimony by stating that, from a neurological standpoint, there was no reason that plaintiff could not continue her regular, full-time employment.
At the time of trial, plaintiff was sixty years old. She testified she is currently employed as a seamstress for the Royal Orleans Hotel, where she has worked for the past nine years. Her primary duties involve making uniforms for the hotel staff and repairing torn bedspreads, drapes, and linen. This work entails sewing by hand as well as the use of a machine.
Plaintiff testified that she began experiencing severe pain in her head, neck and back immediately following the accident. This pain has continued with little abatement. Plaintiff’s supervisor testified that plaintiff was unable to work at all the week following her accident. She returned to work the next week, but was unable to sew. The third week following the accident she worked only one day. The next week she missed one day of work and for two weeks subsequent to that she worked erratically. By the seventh week post-accident, plaintiff had returned to her regular full-time duties. However, plaintiff testified that the numbness in her hands has continued to plague her and that as a result she is not as proficient with her sewing as she used to be. Plaintiff also testified that since the accident her normal activities have been greatly restricted. She complained of chronic pain, an inability to do household chores unassisted, and an inability to exercise or take the walks to which she was accustomed.
The record establishes that the plaintiff has experienced considerable pain and changes in her lifestyle as a result of defendant’s negligence. However, she has continued to work full-time and there is no reason to suggest that she will not be able to do so indefinitely. Although there is ample evidence to support the finding that the accident caused plaintiff to suffer an inflammation of a pre-existing arthritic condition, the evidence with respect to plaintiff’s carpal tunnel syndrome is not as clear. While Dr. Watermeier indicated plaintiff suffers from carpal tunnel syn *756 drome which may require surgery on her right wrist, Dr. Levy was of the opinion that plaintiff does not have this condition at all. More importantly, there is no evidence in the record which directly links this condition to the accident of November 22, 1981. On the basis of the present record, we conclude that whether the plaintiff does in fact have carpal tunnel syndrome is doubtful, and that if she actually does have that syndrome, its causal connection to the accident has not been proved to the certainty required.
We are convinced that the jury based its award in large measure on the conclusion that the plaintiff suffers from carpal tunnel syndrome as a result of the accident and that she will eventually have to undergo surgery for this condition. As articulated above, the record simply does not support this conclusion. Following Reck v. Stevens, supra, we conclude that the $93,-125.00 general damage award constitutes an abuse of discretion.
As directed by Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977), we must now proceed to lower the award for general damages to the highest point within the jury’s discretion. After careful analysis of the injuries sustained by this particular plaintiff, we find that $20,000.00 would constitute a highest proper award under all the circumstances.
Accordingly, the judgment appealed is amended so as to reduce the award from $95,000.00 to $21,875.00 ($20,000.00 general damages plus proven expenses of $1,875.00). As thus amended, and in all other respects, the judgment is affirmed.
AMENDED AND AFFIRMED.

. After plaintiff filed her brief in this court, defendant filed a reply brief. Plaintiff has filed a motion to strike that reply brief, arguing that it contains facts outside the trial record and the original brief on appeal. This contention is without merit. Accordingly, plaintiff’s motion is denied.