CURRAULT, Judge.
This appeal originates in the Twenty-Fourth Judicial District Court, Parish of Jefferson, Division “N”, wherein the Honorable James L. Cannella rendered judgment in favor of plaintiff Terri Krake and against defendants Exxon Company, U.S.A. and Loyal Vern Hoover, in solido, in the full amount of Two Hundred Twenty-Eight Thousand, Six Hundred Sixteen Dollars ($228,616). We affirm.
Terri Krake, a Jefferson Parish deputy sheriff, was on road duty during the early morning hours of July 28, 1981 when she received a dispatch to go to the scene of an overturned gasoline tanker. Loyal Vern Hoover, an employee of Exxon, U.S.A., was in the process of delivering gasoline to a service station when he backed his gasoline tanker into a ditch adjacent to the station overturning it. Gasoline began spilling from the overturned truck onto the surrounding area and was subsequently ignited when it apparently came into contact with a hot water heater located at a nearby house. After the tanker ignited, the fire spread down the drainage ditch causing explosions which sent the sewer covers into the air.
Deputy Krake, who had been assisting in the evacuation of residents from nearby houses, was standing near one of the ditch covers when it exploded and was herself thrown into the air and injured. It is clear that Officer Krake’s injuries are causally related to the negligent operation of the Exxon truck by defendant Hoover.
Defendants appeal asserting the following errors:
(1) The trial court erred in failing to find that plaintiff Ms. Krake assumed the risk and is thus barred from any claims against defendants-appellants.
(2) The trial court erred in failing to find that plaintiff Ms. Krake was contributorily negligent and that her own negligence was the cause in fact and proximate cause of her injuries, and that any judgment against defendants should be reduced by the comparative proportion of plaintiff’s negligence.
(3) The trial court erred in awarding damages for lost future earnings when the examination and testimony of Ms. Krake’s own treating physician indicates that she could work at jobs with equal earnings potential to that which she had at the time of the accident.
(4) The trial court erred in awarding an amount for physical and mental pain and *627 suffering far in excess of that justified by the injuries, if any, suffered by Ms. Krake.
Without question, defendant Loyal Hoover was negligent in overturning his truck during a backing maneuver. LSA-C.C. arts. 2315, 2316, 2317. Hence the only question is whether plaintiff, by reason of her employment as a police officer, assumed the risk of the harm encountered; and, if not, whether she was guilty of contributory negligence in not moving further away from the scene of the accident once it became apparent that the spreading gasoline had ignited.
The essential elements of assumption of the risk are: (1) knowledge and appreciation of the danger on the part of the victim; and (2) a voluntary encountering of that danger. Burmaster v. Gravity Drainage Dist. No. 2, 448 So.2d 162 (La.App. 5th Cir.1984); Giovingo v. Cochiara, 449 So.2d 699 (La.App. 5th Cir.1984), writ denied September 14, 1984. After reviewing the record we conclude that plaintiff was ordered to the scene in her professional capacity without choice or alternatives. Accordingly, as the exposure to the risk-causing danger was not voluntarily encountered, the defense of assumption of the risk is inapplicable.
Appellants argue plaintiff was con-tributorily negligent in that she placed herself in a position of open and obvious danger failing to exercise the care that a reasonably prudent person would exercise under these circumstances. The trial court concluded appellants “have not borne their burden of proof, by a preponderance of the evidence, relative to their .defense of ... contributory negligence.”
Plaintiff was in the process of evacuating local residents when the spreading gasoline ignited. She and her fellow officers ran down the street away from the immediate area as the overturned truck caught fire. Once she was approximately one-half block away, she stopped, turned, and saw the firemen fighting the blaze. The flames engulfing the truck ignited the gasoline in the drainage ditch which in turn began to explode sending drain covers into the air. Plaintiff was near one of those covers as it and she were lifted into the air.
Plaintiff testified when she turned to run, she simply “took off” down the middle of the street which was where she was when the fire began. We cannot see how she contributed to her injuries through any of her actions or omissions. She responded to the situation she faced as any reasonably prudent person would. The fact that she was close to a drain cover does not constitute negligence; nor that she did not instantaneously remove herself from close proximity to a drain cover as they began to explode. After a complete review of the record, we cannot say the trial judge was “clearly wrong.” Arceneaux v. Do-mingue, 365 So.2d 1330 (La.1978).
QUANTUM
Appellants’ problem with the damages awarded for plaintiffs lost future earnings stems from the fact that there were two depositions given by Dr. Rubin, plaintiffs treating physician. The initial deposition was taken February 10, 1983 and was utilized at trial by Mr. Bobby Roberts, plaintiffs rehabilitation expert. The second deposition, dated October 17, 1983, was not taken until after trial and thus unavailable to those testifying at trial. Appellants argue the second deposition contradicts the conclusions relied upon by the trial court.
The trial court heard the testimony of Mr. Roberts and that of Mrs. Jennifer Palmer, defendants’ rehabilitation expert. The trial judge, considering the testimony of these two vocational experts, chose to rely upon the testimony and findings of Mr. Roberts, concluding he was “more reasonable, convincing and [his findings] were based more accurately on evidence heard at trial.” Appellants argue such reliance was improperly placed as Dr. Rubin’s second deposition contradicts the basic assumptions contained in the first deposition which Mr. Roberts had based his opinion upon. Appellee argues Dr. Rubin’s second deposition does not contradict the findings in his *628 first, but rather gives stronger support for the trial court’s conclusions.
Dr. Rubin’s second deposition was taken October 17, 1983, some ten days after the trial had been had and for the specific purpose of updating Dr. Rubin’s treatment from the date of his earlier deposition. In the follow-up deposition, Dr. Rubin testified that Ms. Krake had seen him again in April of 1983 and related that she had had an additional blackout spell and as a result of the blackout had fallen and torn tendons in her right leg which necessitated treatment by an orthopedic surgeon. She related to him in April of 1983 that the balance problems and dizzy episodes were continuing pretty much as they had been previously but she had only blacked out this one particular time. Again, Dr. Rubin’s tests in April of 1983 confirmed his previous diagnosis.
She was next seen in August of 1983 and reported that in the interim she had not had any additional blacking out spells but was continuing to have dizzy episodes at about the same frequency. She was last seen on September 27, 1983 and again reported no additional blackout spells since the April, 1983 visit but continued to complain of dizziness. Dr. Rubin did note that some of the test results had improved somewhat but also cautioned that she had had previous improvements on an occasional basis and then regressed to a lower level thereafter. When queried as to his final opinion regarding her work restrictions, Dr. Rubin testified:
“Well again, as we discussed in the previous deposition, the physical restrictions are divided into two categories. One is in terms of her working capabilities and the same restrictions are still there; that is, no hazardous occupation, surely and she surely couldn’t be back as a deputy, nor could she work in the construction industry at heights, nor would you want to have her on a crew boat if that were the idea for being transported to some place of occupation on board a moving vessel. On the other hand, a sedentary occupation with an understanding employer who would be surely in order, if that fit within the framework of her complaints and direction. So that workwise, no hazardous occupation, nothing in the moving circumstance or dangerous equipment; sedentary occupation. From the standpoint of her daily life, there are no restrictions in what she shouldn’t do, but there would surely be some occupational problems if she were going to overdo in terms of certain kinds of exercises or functions in everyday life. But usual functions, she could get along as well as most people, except for certain times when she might have an episode of dizziness, which would be the same kind of thing that you could get in trouble with at work.
QUESTION: When you say that she could do sedentary work with an understanding employer, would you explain to me what you perceive that to mean, “with an understanding employer?”
ANSWER: Well sedentary employment, I think speaks for itself. A sitting job or something where she would — she could stand at a job if, in fact, there were rest periods where she could sit. And an understanding employer meaning someone who understands all these things we have talked about in her medical history and that in fact, she might, while at work, have a dizzy episode where she might need to knock off for the day or at least one half hour or an hour until she regained her balance composure.
QUESTION: Would you say that Terri’s balance problem is something that will be with her indefinitely?
ANSWER: Well again, as we talked about in the previous deposition, the category of improvement that she is in is not in the Class A category. She is not one that you would definitely say she is going to get well and have no problems. She is in Class B or Class C because of the time that this has dragged on, as many of these kinds of problems do. And there is no one at this point who could say or could tell by any tests that is (sic) known that she would be perfectly well and would stay that way. Very *629 specifically, she is at a point now where she was once before. She stayed there for a few months and then had some exacerbation of her problem. It started all over. She didn’t go down as low as she had been as far as her balance system,, but she got in trouble_” Deposition II, October 17, 1983, pp. 8-11. (Emphasis added)
Based on the foregoing recitation of excerpts from Dr. Rubin’s second depositions, it is clear that the original restrictions placed on Ms. Krake’s activities were continuing. In fact the prognosis was extremely guarded in that the doctor could not say whether Ms. Krake would get any better or worse as the years went by. He did state however that plaintiff would never be perfectly normal because a sufficient period of time had passed wherein if one’s balance system were going to recycle and/or correct itself it would have already done so.
Based on those physical problems, Mr. Roberts testified that Ms. Krake had an unusual and a severe vocational handicap. His rationale for concluding that plaintiff’s vocational handicap was unusual and severe was that her balance problems and dizzy spells as well as blackout problems could not be controlled with medication. Dr. Rubin testified that there were no surgical procedures or medications that could control this sort of brain stem abnormality. So, unlike someone who has traumatic epilepsy, whose seizure disorder may be controlled with medication, Ms. Krake’s problem may occur at any given point in time and cause her to lose her balance and fall and sustain further injuries to herself or others. Based on plaintiff’s medical problems, Mr. Roberts felt that Ms. Krake would have difficulty in finding an “understanding employer” and that any vocational evaluation would begin with a retraining program whose prognosis would be guarded based on the physical problems.
Mr. Roberts was asked to assume that Dr. Rubin would testify that the only, type of employment Ms. Krake would qualify for would be sedentary type employment with an understanding employer so that if she had a physical problem she could lie down. He was then asked to give an opinion, considering his expertise in the labor market, as to whether or not that sort of sedentary position is available. He responded:
... only sedentary type jobs that would be safe that we have demonstrated skills for would be in a security area where a person might monitor the flow, for example, a person outside Charity Hospital counting people walking in and out of the door but even in that type of situation if the person wasn’t alert, or if they were subject to blackouts there might be a security problem and I doubt seriously if the person would qualify in that type of area. When we look at other sedentary type jobs, there are those jobs that require a degree of training skills at least two years worth of training to access those and since those skills aren’t currently exhibited we can’t say that the person can do that.
When it comes to sympathetic employers, employers are not sympathetic these days and, like I said, really haven’t been since the seventies because they don’t have to be. Unemployment in this area has — is actually well above twenty percent and when you look at all of the data, not just including what the Department of Labor does, there is obviously an oversupply of people for few jobs and to go to an employer and say take this person with these type restriction (sic) they don’t have to and they generally don’t.
The gist of Mr. Roberts’s testimony was that because of Ms. Krake’s physical problems it will be extremely difficult to retrain her. The only positions that would currently be available on a sedentary type basis for which she has demonstrated skills (security type work) will generally not be available to her because, in his opinion, employers are not going to be sympathetic and make the sort of allowances that Dr. Rubin suggested would have to be made especially when there are an abundance of *630 able bodied workers applying for the same position.
The trial court, relying upon Dr. Rubin and Bobby Roberts, awarded plaintiff lost future earnings based upon her ability to earn simple minimum wage. Appellants argue that an award for lost future wages was unnecessary because their own rehabilitation expert testified that Dr. Rubin indicated plaintiff was capable of obtaining work at various jobs with equal earnings potential to that which she had at the time of the accident.
Appellants’ rehabilitation expert, Ms. Palmer, testified that Ms. Krake was capable of getting and holding a number of jobs in the local labor market. This was based upon a letter Ms. Palmer sent to Dr. Rubin suggesting ten different jobs and requesting Dr. Rubin to state yes or no as to plaintiffs ability to perform that job. Dr. Rubin responded yes to nine of the proposed jobs but qualified those answers by stating his answers were based solely on plaintiff’s balance problems.
However, after testifying that the plaintiff could get and hold a number of various jobs, Ms. Palmer was asked ■ whether Ms. Krake could hold those jobs if she actually blacks out and falls down or if she has such severe headaches that she has to lie down. Her response was, “no, plaintiff would not.”
Ms. Palmer further admitted, under cross-examination, that when she called specific employers to query as to whether or not they would hire someone with Ms. Krake’s physical problems that she did not get into specifics. She did not tell them that Ms. Krake might in fact black out and fall and injure herself or someone else. Further showing her complete lack of information with regard to this specific case, she said if Ms. Krake did have a seizure disorder that she could get medication for the seizure.
The trial court’s reliance upon the testimony of Dr. Rubin and Mr. Roberts for the assessment of wage loss was reasonable. The trial court stated that although the wage loss and dimunition of earning capacity could not be computed with exactitude and/or certainty, citing Viator v. Gilbert, 253 La. 81, 216 So.2d 821 (1968), nevertheless Ms. Krake’s physical disability was unusual and severe and that she could no longer perform the duties of her former employer and could in fact only work at minimum wage. After reviewing the record, we find the trial court, in awarding loss of past and future earnings, exercised sound judicial discretion in making such award. There was no abuse of discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977).
Appellant lastly complains that the award for physical and mental pain and suffering was far in excess of that justified by the injuries, if any, suffered by Ms. Krake.
The plaintiff was awarded Sixty-Two Thousand, Five Hundred Dollars ($62,-500) in general damages for mental and physical suffering and disability. That sum represented Twelve Thousand, Five Hundred Dollars ($12,500) from the date of the accident to the date of trial and Fifty Thousand Dollars ($50,000) in future damages. The trial court stated as follows:
Plaintiff, as a direct result of the accident, suffered past, present and future injuries, pain, suffering and damages. The quality of plaintiff’s life has been significantly and drastically affected by the accident and her injuries. Said injuries will reasonably occur for an indefinite period of time.
Considering the nature and permanency of the injuries suffered by plaintiff herein, as well as awards made in similar cases, the Court concludes that past mental and physical pain and suffering for a period of approximately two and a half years from the date of the accident to the date of trial, is assessed at $12,500.00. Future mental and physical pain and suffering, over the plaintiff’s life expectancy of 55 years is assessed at $50,000.00.
Appellants offer no real support for their argument that this item or award of damages is excessive. The record is replete *631 with testimony regarding the changes in plaintiffs personality and how her life has been affected by the accident and resulting physical sequelae.
There is ample evidence in the record to support the award given. We recognize that the trial court is granted much discretion in assessing such intangibles as mental and physical pain and suffering. Absent a showing of abuse of that discretion, we will not alter the award. Coco v. Winston Industries, Inc., supra.
Accordingly, for the foregoing reasons, the judgment of the trial court in favor of appellee, Ms. Terri Krake, against appellants, Exxon Company, U.S.A. and Loyal Yern Hoover, in solido, is hereby affirmed at appellants’ costs.
AFFIRMED.