SAVOIE, Judge.
This is a personal injury suit arising out of a single vehicle accident. The plaintiffs, Owen and Maggie Watts, brought an action against the defendant, Tangipahoa Parish Council (Parish).[1] From a judgment in favor of Mrs. Watts, the Parish appeals.
FACTS
On December 6, 1985, at about 5:30 p.m., Owen D. Watts, owner and driver, and Maggie Watts, guest passenger, were driving down Wardline Road in Tangipahoa Parish in an easterly direction when the right front tire of their vehicle struck a pothole located in the road causing the vehicle to veer into the ditch and flip over on its side.
Mr. Watts sustained minor injuries as a result of the accident. Mrs. Watts sustained severe injuries to her upper back, neck and shoulder. The trial court awarded Mrs. Watts $396,266.72 in damages plus legal interest and court costs.
ACTION OF THE TRIAL COURT
The trial court found that the section of road where the accident took place was a parish road under the exclusive control of the Tangipahoa Parish Council. The trial court also found that a pothole caused the accident; that the pothole created an unreasonable risk of injury; that the condition was or should have been known by the Parish; and that no reasonable steps were taken to correct it.
ASSIGNMENTS OF ERROR AND ISSUES FOR REVIEW
1. The trial court erred in ruling an indention in Wardline Road was an unreasonable hazardous and dangerous defect because an accident occurred at the site of the indention.
2. The trial court erred in ruling that the Tangipahoa Parish Council had or should have had knowledge of an indention on Wardline Road and failed to correct the condition within a reasonable time when there was no testimony or evidence at trial showing the Parish’s actual knowledge of the indention nor was there testimony or evidence of the length of time the indention had existed *1065 prior to the accident such that the Parish’s knowledge could be inferred.
3. The trial court erred in ruling that an indention of Wardline Road was the complete cause of the accident when the plaintiffs contradicted their original story, and had originally asserted that the accident was caused by the driver’s fault.
4. The trial court erred in finding plaintiff had a loss of future wages and/or earning capacity when the plaintiff left the workforce because of a preexisting heart condition, and never returned to the work force although she and all of her treating physician [sic] acknowledged that she was able to return.
ASSIGNMENTS OF ERROR NOS. 1, 2, and 3
The Parish contends that the trial court erred in finding that the sole cause of the accident was the pothole. The Parish supports this contention with the testimony of Cynthia Vernon, an employee of Louisiana Farm Bureau. Ms. Vernon testified from a claims report which she had taken over the phone from Mrs. Watts five days after the accident. Ms. Vernon testified that the report stated that Mr. Watts was traveling at 50 mph and that he overcorrected after he struck the pothole.
Mr. Watts testified that he was traveling at 40 mph and that because he was unaware of the pothole he had no time to react once his front tire struck it. At trial, Mrs. Watts testified that Mr. Watts was traveling 35 to 40 mph. John Francis, Deputy Sheriff of the Tangipahoa Parish Sheriff’s Office, the investigating officer, testified that the speed limit in the area was 35 mph. Deputy Francis’ testimony corroborated Mr. Watts’ version of the accident. According to Deputy Francis’ testimony, Mr. Watts committed no violations. He further testified that if a driver did not know the pothole was there he would be unable to see it as he approached it. Mr. Watts’ testimony is further corroborated by the testimony of Raymond Burkhart, an accident reconstructionist. Burkhart relying on Deputy Francis’ testimony about the location of the vehicle in the ditch, concluded that Mr. Watts’ reaction time was one second. Burkhart further stated that a one second reaction time at 40 mph would leave Mr. Watts no time to react.
A court of appeal may not set aside a trial court’s finding of fact unless it is manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). We cannot say that the trial court’s finding that the pothole was the sole cause of the accident is clearly wrong or manifestly erroneous. The trial court obviously considered all the evidence adduced at trial concerning the cause of the accident rather than focusing on the conflicting statements made by Mrs. Watts.
The record is clear that a pothole existed. Therefore, this court must next determine whether the pothole created an unreasonable risk of injury. The State has a duty to travelers to keep the state’s highways and their shoulders in a reasonably safe condition. Manasco v. Poplus, 530 So.2d 548, 549 (La.1988). In Michel v. Ascension Parish Police Jury, 524 So.2d 1369 (La.App. 1st Cir.), writ denied, 530 So.2d 567 (La.1988), this court found that the duty of a parish police jury in maintaining a highway in its control is the same as the duty of the state in maintaining a highway in the state highway system. Whether the parish has breached this duty, that is, whether the roadway and shoulders at the scene of the accident were in an unreasonably dangerous condition, will depend on the particular facts and circumstances of each case. Manasco, 530 So.2d at 549.
Wardline Road is a two lane rural road in Tangipahoa Parish. The lanes are approximately nine feet wide with shoulders approximately three and a half to four feet wide. The ditch bordering the road is approximately one and a half to two feet deep. No measurements of the pothole were taken at the time of the accident. In 1988 Burkhart took measurements of the patch over the pothole. He found the patch to be 11 feet in length and 4.2 feet in width. Although he did not take any precise measurements, Joe Costanza, a nearby resident, estimated the hole to be between six to eight inches deep and four and one *1066 half feet wide. Costanza, who arrived at the scene shortly after the accident, also testified that if he had stepped into the hole on the night of the accident it would have gone over his boots. In the light of this testimony, we cannot say that the trial court was “clearly wrong” or manifestly erroneous in determining that this pothole created an unreasonable risk of injury. Rosell v. ESCO, 549 So.2d at 844.
Mrs. Watts has asserted theories of liability under both strict liability and under negligence. It is well settled that for a plaintiff to recover under a negligence theory he must prove that the parish had actual notice of the condition or that its existence continued over a period and that with the exercise of due diligence the parish or municipality would have had notice. Pickens v. St. Tammany Parish Police Jury, 323 So.2d 430 (La.1975). See Bou-doin v. City of Kenner, 556 So.2d 123 (La.App. 5th Cir.1990). A plaintiff seeking to recover under a strict liability theory against a public entity must now also prove that the public body had actual or constructive knowledge of the condition.[2]
Wardline Road was overlaid sometime in 1984[3] and potholes continued to develop after its overlay. The Parish had received notice of the general condition of the road through area residents, including Costanza. Although there was testimony as to the development of potholes on Wardline Road, Costanza was the only one to testify about the pothole in question. Costanza testified that the pothole in question was present for about one month prior to the accident.
In Guilo v. Sewerage and Water Board of New Orleans, 535 So.2d 23 (La.App. 4th Cir.1988), the court found that the Sewerage and Water Board had constructive knowledge of a cracked water meter cover which had been in existence for at least one month. Likewise in Swain v. Sewerage & Water Board of New Orleans, 413 So.2d 233 (La.App. 4th Cir.1982), the court found that the Sewerage and Water Board had constructive knowledge of a missing cover where the cover had been missing for two and a half weeks. Here we have testimony that the area had a long history of pothole problems and that the particular pothole which caused the accident had existed for at least one month. Application of the rationale of the Gullo and Swain case leads us to conclude that the trial court’s finding that the Parish knew or should have known about a pothole that had been in existence for one month is not manifestly erroneous. For these reasons, these assignments of error have no merit.
ASSIGNMENT OF ERROR No. 4
The Parish assigns as its last error the trial court’s award of $210,000.00 for loss of wages, loss of future wages and loss of earning capacity.
Before an appellate court can disturb an award for damages the record must clearly show the trial court abused its discretion and making said award. The trial court’s *1067 award may not be modified unless it is unsupported by the record. The question is not whether a different award may have been more appropriate, but whether the trial court’s award can be reasonably supported by the record. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Black v. Ebasco Services, Inc., 411 So.2d 1159 (La.App. 1st Cir.), writ denied, 414 So.2d 1253 (La.1982).
Mrs. Watts was employed by the Louisiana Department of Hospitals (LDH) as an accountant from 1975 .to February 1983. In 1983, she left LDH because of a heart condition. Dr. Blackwell, her treating physician at that time, stated that Mrs. Watts would be able to return to work on June 1, 1983. Mrs. Watts never returned to LDH. Mrs. Watts’ next job was as business manager of BM Construction, a company formed by her and her husband. The business was a going concern for about six months. Mrs. Watts was a student at Southeastern University from 1976 to 1986 for about ten semesters.
As a result of the accident, Mrs. Watts was treated and' seen by numerous physicians from January 1986, to April, 1989. During this period, Mrs. Watts underwent both surgery and treatments on her neck and shoulder.
The Parish supports its contention that the court erred in its damage award by pointing to the testimony of Doctors Brunet, Richardson, and Kewalramani as to Mrs. Watts’ ability to work after the accident. However, our review of the testimony of these doctors as to Mrs. Watts’ ability to work indicates that their testimony was equivocal and conditional. The opinion of Dr. Brunet, an expert in orthopedics, as to Mrs. Watts’ ability to do office work was conditioned on the function of her shoulder only. His opinion did not take into account Mrs. Watts’ neck injury. The opinion of Dr. Kewalramani, an expert in physical medicine and rehabilitation, as to her ability to do desk work was conditioned on whether she will be able to have periodic interruptions during her work day, and be able to use both muscle relaxants and anti-inflammatory drugs. Dr. Richardson, a neurologist, when asked whether she could do bookkeeping, answered, “I think so.” While the Doctors seemed unsure of Mrs. Watts’ ability, Mrs. Watts testified that she was still in pain and that she was limited in her household chores and her ability to drive any significant distance. When asked whether she would be able to take a job if offered to her, she answered, “I could not give an honest days work for an honest days pay.”
We note that Mrs. Watts left the work force in 1983 because of an existing heart condition and did not return. However, we also note that as of the date of the accident she had returned to work and had been so employed for several months.
In March 1988, Cornelius E. Gorman, a vocational rehabilitation and employment expert, examined Mrs. Watts. After having Mrs. Watts undergo a series of tests, he concluded that prior to the accident she had demonstrated a competitive employment profile and that as a result of the accident she had a noncompetitive employment profile.
Dr. Seymour Goodman, an expert in the field of economical evaluation for loss wage, and impairment of earnings, estimated her lost wages and loss of future wages. Dr. Goodman’s calculations were based on a $300.00 per week salary from the construction business. The doctor found that the lost wages totalled $208,518.96.
Based on the testimony, we do not feel that the trial court abused its discretion in its award of loss of wages, loss of future wages, and loss of earning capacity.
For the above and foregoing reasons, the judgment of the trial court is affirmed. The Parish is to pay all costs in the amount of $1,586.00.
AFFIRMED.

. The Parish is not appealing the loss of consortium award to Owen D. Watts. Also, the State of Louisiana was brought in by the Parish on a third party demand. The trial court found that the Parish had exclusive control of the road and the state did not. The Parish has not appealed that decision.

. LSA-R.S. 9:2800 dealing with limitations of liability for public bodies, reads as follows:
A. A public entity is responsible under Civil Code Article 2317 for damages caused by the condition of buildings within its care and custody.
B. Except as provided for in Subsection A of this Section, no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
C. Constructive notice shall mean the existence of facts which infer actual knowledge.
D. A violation of the rules and regulations promulgated by a public entity is not negligence per se.
E. "Public entity” means and includes the state and any of its branches, departments, offices, agencies, boards, commissions, instru-mentalities, officers, officials, employees, and political subdivisions and the departments, offices, agencies, boards, commissions, instru-mentalities, officers, officials, and employees of such political subdivisions.

. Maurice Oliver Jordan, a civil engineer with the Department of Transportation and Development, testified that an agreement between the state and Tangipahoa parish was confected so that the state would fund the project. The contract with the state was signed on March 21, 1983 and the construction completed sometime in 1984.