NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

16-277

MAURICE FONTENOT, ET AL.

VERSUS

JARRED LEVAR STEVENS, ET AL.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2009-1900
HONORABLE SHARON D. WILSON, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

PHYLLIS M. KEATY
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Billy Howard Ezell, and Phyllis M. Keaty, Judges.

AFFIRMED.

**Michael R. Sistrunk**
**Matthew J. Garver**
**Lou Anne Milliman**
**Lynda A. Tafaro**
**McCranie, Sistrunk, Anzelmo,**
**Hardy, McDaniel & Welch**
**195 Greenbriar Boulevard, Suite 200**
**Covington, Louisiana 70433**
**(504) 831-0946**
**Counsel for Defendants/Appellants:**
  **Republic Fire and Casualty Insurance Company**
  **Carl's Rentals**
  **Jarred Levar Stevens**

**Randall E. Hart**
**Aaron Broussard**
**Steven Broussard**
**Broussard & Hart, LLC**
**1301 Common Street**
**Lake Charles, Louisiana 70601**
**(337) 439-2450**
**Counsel for Plaintiffs/Appellees:**
  **Maurice Fontenot**
  **Susan Melton Fontenot**

**KEATY, Judge.**

Defendants/Appellants, Jarred Levar Stevens, Carl's Rentals, and Republic Fire and Casualty Insurance Company, appeal the trial court's judgment in favor of Plaintiffs/Appellees, Maurice Fontenot and Susan Melton Fontenot. For the following reasons, the trial court's judgment is affirmed.

## FACTS & PROCEDUREAL HISTORY

Susan sustained injuries following a rear-end motor vehicle collision on March 4, 2009. She was stopped at a traffic signal when Jarred, who was driving a furniture delivery truck, hit her vehicle from behind. Thereafter, Susan suffered from neck, back, and shoulder pain.

Susan and her husband, Maurice, filed suit against Defendants. Defendants stipulated to liability, and Jarred was voluntarily dismissed on November 3, 2011. Following a jury trial on damages which occurred on May 6-10, 2013, the jury returned a $500,500.00 verdict as follows: past medical expenses—$235,500.00; future medical expenses—$100,000.00; past and future physical pain and suffering—$150,000.00; past and future mental pain and suffering—$0.00; loss of enjoyment of life—$0.00; and loss of consortium—$15,000.00.

Plaintiffs filed a Motion for Judgment Notwithstanding the Verdict (JNOV), which was granted following a July 3, 2013 hearing wherein Judge Wilford Carter increased the verdict to $1,075,417.90, as follows: past medical expenses—$235,417.90; future medical expenses—$240,000.00; past and future physical and mental pain and suffering—$450,000.00;[1] loss of enjoyment of life—$100,000.00; and loss of consortium—$50,000.00. The JNOV was signed on August 13, 2013.

_____

[1] Although the jury verdict awarded general damages in the amount of $150,000.00 for past and future physical pain and suffering, and $0.00 for past and future mental pain and suffering, Judge Carter combined the general damage award for both past and future physical and mental pain and suffering and increased it to $450,000.00.

Defendants appealed the JNOV based upon prematurity, alleging that the trial court failed to sign the judgment on the jury verdict prior to the JNOV. On appeal, this court found that the trial court lacked jurisdiction and remanded it with instructions to enter judgment in conformity with the jury's verdict. *Fontenot v. Stevens*, 14-95, 14-317, 14-607, 14-635 (La.App. 3 Cir. 12/10/14), __ So.3d __ (unpublished opinions), *writ denied*, 15-75 (La. 4/2/15), 163 So.3d 795.

On April 29, 2015, Judge Sharon Wilson, who replaced Judge Carter, signed a Judgment conforming to the jury's verdict. Plaintiffs filed another Motion for JNOV which was heard on September 9, 2015, and taken under advisement. The trial court issued its Written Reasons for Judgment on November 6, 2015, and signed the written Judgment on December 28, 2015. Therein, the trial court, Judge Wilson, granted the JNOV.

Defendants appeal the trial court's grant of JNOV and the trial court's increased damage award by asserting the following assignments of error:

1. The standard on JNOV is whether the facts and inferences point so strongly in favor of plaintiffs that reasonable persons could not reach different conclusions. Judge Sharon Wilson erred as a matter of law in not applying this standard and in giving great deference to Judge Carter rather than the jury.

2. The trial court erred in granting plaintiffs' *Motion for JNOV*, and doubling the jury's award, because "there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions."

## STANDARD OF REVIEW

Our supreme court, in *Anderson v. New Orleans Public Service, Inc.*, 583 So.2d 829, 832 (1991), stated the following:

A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion

2

should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. *Scott* [*v. Hosp. Serv. Dist. No. 1 of St. Charles Parish*, 496 So.2d 270 (La.1986)]. In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.

In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable men in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated.

In the case before us, we will look to each element of the judgment and review whether the trial court's grant of the JNOV was proper. We will thereafter review those items where we find the grant of the JNOV proper to determine whether the amount set by the trial court was appropriate.

## I.   Trial Court - Standard of Review

In its first assignment of error, Defendants contend that Judge Wilson erred as a matter of law by not applying the applicable JNOV standard. Defendants argue that Judge Wilson inappropriately gave deference to Judge Carter rather than the jury and failed to make an independent record to determine whether the JNOV was warranted. In support, Defendants point to Judge Wilson's Written Reasons for Judgment (emphasis added):

As the current judge presiding who was not afforded the opportunity to hear the testimony of the witnesses, or the presentation of evidence, **great deference is given to the trial judge**. The trial judge is in a better position to make a damage assessment. The trial

judge hears the testimony, views the evidence, and is able to evaluate the credibility of the witnesses. Once the jury verdict is set aside under the strict JNOV standards, the trial court is then the trier of fact.

Defendants' argument is without merit as the record shows that Judge Wilson reviewed and considered the record as per the JNOV hearing wherein she stated:

It's appropriate that I take this case under advisement and review everything including the entire record and all briefs. And some of the things that you all pointed to me that I didn't review before coming in today. So I will issue a ruling on a self-imposed deadline . . . in twenty days[.]

It took longer than twenty days for Judge Wilson to review the record, evidence, and briefs since she issued her Written Reasons for Judgment on November 6, 2015, which was fifty-eight days following the September 9, 2015 hearing.

The filings by both parties in this matter show that Judge Wilson was directed to the most important evidence. After viewing the entire record, she set the jury's verdict aside. "Once the jury verdict is set aside under the strict JNOV standards, the trial court is then the trier of fact." *Anderson*, 583 So.2d at 834. After setting the verdict aside, Judge Wilson agreed that Judge Carter was in a better position to determine quantum, and it was not error for her to reach the same conclusion as Judge Carter. Accordingly, Defendants' first assignment of error is without merit.

## II.    Grant of JNOV

In its second assignment of error, Defendants contend that the trial court erred in granting Plaintiffs' Motion for JNOV and doubling the jury's award because reasonable men in the exercise of impartial judgment could reach different conclusions. For the following reasons, we find no merit in Defendants' argument.

4

## A.      Past and Future Physical Pain and Suffering

In this matter, the jury awarded $150,000.00 for past and future physical pain and suffering, which the trial court increased on JNOV.  To determine whether the trial court erred, *Anderson*, 583 So.2d at 834, provides:

> The appellate court, in determining whether the trial court erred in granting the JNOV as to quantum, once again uses the criteria set forth in *Scott*, [496 So.2d 270], i.e., could reasonable men in the exercise of impartial judgment differ as to the fact that the jury award was either abusively high or abusively low.  If the answer is in the affirmative, then the trial court erred in granting the JNOV, and the jury's damage award should be reinstated.  On the other hand, if the answer is in the negative, then the trial court properly granted the JNOV, and its damage award based on its independent assessment of the damages is the judgment of the trial court which is reviewed on appeal under the constraints of *Coco*, [*v. Winston Indus., Inc.*, 341 So.2d 332 (La.1976)].

The medical evidence and testimony in this case reveal that Susan was in excellent health prior to the accident.  Susan's trial testimony indicates that her health deteriorated following the collision.  The collision occurred, according to Susan's testimony, while she was sitting in her car at a traffic signal when "the biggest impact ever just hit my car[.]"  She stated that she hit the back of her head and her body was in "excruciating pain."  Susan revealed that she had a "very, very bad headache" and that her neck and her "whole body was just in severe pain."

Medical records indicate that Susan was transported by ambulance to the Women's and Children's Hospital emergency room.  The ambulance records show that she complained of neck and posterior/spine pain although she did not complain of a head injury or lose consciousness.  Hospital records reveal that Susan presented with chest problems, bad headaches, back and neck pain, sore chest, ear leakage and ringing, and memory loss.

5

*Lumbar Treatment & Surgery*

Following the collision, Susan began treating with Dr. Clark Gunderson, an orthopedic surgeon. Dr. Gunderson's trial testimony indicates that she initially presented to him on March 10, 2009, for neck and back pain along with severe headaches associated with the accident. He stated that the pain in Susan's thoracic region was in the mid-part of her spine and that her lower back pain radiated down her left leg to her foot. Dr. Gunderson noted that "she had a fairly severe neck and lower back sprain or whiplash type injury." He revealed that he treated Susan conservatively by referring her to physical therapy and prescribing pain medications, muscle relaxants, and anti-inflammatory medications.

Certified medical records show that Susan participated in thirteen physical therapy sessions from March 17, 2009 through March 14, 2013. Dr. Gunderson testified that he administered three lumbar epidural steroid injections. The injections were unsuccessful such that Dr. Gunderson recommended a microscopic lumbar laminectomy and discectomy at L5-S1 according to his testimony. He testified that this surgery would alleviate Susan's leg pain.

Prior to surgery, Defendants hired Dr. James Perry, an orthopedic surgeon, to perform a defense medical examination (DME). The DME was performed on March 14, 2011, according to the medical records. Therein, Dr. Perry opined that Susan exhibited "low grade spondylolisthesis, which is most like [sic] the cause of her symptoms." He did not believe a discectomy was necessary and recommended injecting her facet joints to determine the source of her pain. Dr. Perry stated that should the injections be unsuccessful, "this level [L5-S1] may require surgical treatment." Pursuant to August 23, 2011 correspondence, Dr. Perry recommended that Susan undergo a Transforaminal Lumbar Interbody Fusion (TLIF).

At trial, Dr. Gunderson referred to Dr. Perry's surgical recommendation and explained that a TLIF is a more complex operation than a lumbar laminectomy and discectomy since it involves a spinal fusion. He explained that a spinal fusion could be performed in the future if the more conservative operation recommended by Dr. Gunderson, i.e., the lumbar laminectomy and discectomy, failed to alleviate Susan's pain.

Medical records reveal that on April 7, 2011, Susan underwent the lumbar laminectomy and discectomy. Dr. Gunderson testified that Susan initially felt relief following the surgery as her "leg pain was much improved." He indicated that six weeks post-surgery, she was no longer experiencing lower back pain and had only occasional shooting pain into her left thigh.

Dr. Gregory Rubino, a neurosurgeon, began treating Susan on July 3, 2012, for neck and back pain according to his video deposition testimony. He testified that he ordered a Magnetic Resonance Imaging (MRI) test which was performed on July 20, 2012. The results, according to his testimony, revealed spondylolisthesis, which Dr. Rubino defined as "one vertebral body slipping on the another becoming slightly more anterior." Dr. Rubino agreed that this condition suggested spinal instability.

The record contains the video deposition of Dr. Donald Thigpen, a chiropractic physician, who testified that he treated Susan for lower back therapy following a referral from Dr. Rubino. Dr. Thigpen stated that Susan presented to him on January 14, 2013, wherein he administered x-rays which revealed spondylolisthesis at L5-S1. He defined spondylolisthesis as a vertebra that slips forward in relation to the vertebra below, which indicates "some ligament damage at that level." Dr. Thigpen stated that ligaments hold bones in their proper

alignment although they can be torn, stretched, or damaged by trauma such as a motor vehicle accident.

*Neck Pain & Cervical Surgery*

Dr. Gunderson testified that following Susan's lumbar discectomy, "[h]er biggest complaint at this point was her neck pain." He stated that she underwent two rounds of physical therapy. Dr. Gunderson revealed that he administered two cervical epidural steroid injections, which medical records show occurred in August and September of 2011.

According to his testimony, Dr. Rubino ordered an upper and lower extremity electromyography (EMG), a lumbar and cervical MRI which was taken on July 20, 2012, and a discography. He stated that the results caused him to recommend a C3-4 anterior discectomy and fusion. Medical records reveal that Susan underwent the neck surgery on August 23, 2012. Dr. Rubino stated that following the surgery, Susan's neck pain was better.

*Shoulder Surgery*

Dr. Rubino's medical record dated October 12, 2012, indicates that Susan was experiencing shoulder pain which was "new since [cervical] surgery." Her shoulder pain was masked by her previous neck pain according to Dr. Rubino's testimony. Dr. Brett Cascio's video deposition testimony indicates that he agreed with Dr. Rubino with respect to the masking of pain.

Dr. Cascio, an orthopedic surgeon, testified that he began treating Susan for left shoulder pain on December 6, 2012, following a referral from Dr. Rubino. Dr. Cascio indicated that he ordered a shoulder MRI, which revealed that Susan suffered from a torn rotator cuff and labrum. He agreed that the MRI results were objective. In an April 11, 2013 medical note, Dr. Cascio recommended that Susan

undergo a left shoulder arthroscopy as she was still experiencing "excruciating pain" following physical therapy and a previously administered steroid injection.

Susan underwent the shoulder surgery on April 24, 2013, according to Dr. Cascio's operative report, and the following postoperative diagnoses were reported: adhesive capsulitis; biceps tendinitis; partial tear; high-grade rotator cuff tear; superior and anterior labrum tear; synovitis; and acromiclavicular arthrosis. Dr. Cascio noted in correspondence that same day that Susan's rotator cuff tear "at the time of surgery demonstrated evidence that it was caused by a traumatic injury." He opined therein that "the tear occurred some time in the past because of scarring and rounded edges of tissue which indicated an older rather than newer injury." He said that it was "more probable than not that her injuries occurred at the time of the car accident on March 4, 2009."

*Future Medical Care - Life Care Plan*

Dr. Rubino prepared a future medical life care plan, which is dated February 5, 2013. Therein he anticipated Susan's future medical needs regarding her lower back as follows: lumbar MRI once every two years; lumbar physical therapy, three times per week for eight weeks annually; pool membership for water aerobics; lumbar epidural steroid injections twice annually; bilateral lower extremity EMG once every two years; pain management physician to monitor and prescribe pain medication twelve times per year; and neurosurgeon appointments twice annually. Dr. Rubino anticipated the foregoing conservative treatment would be required for the remainder of Susan's life. He also indicated that Susan would "likely need future lumbar surgery[.]"

We find that the medical testimony and evidence contained in the record are so compelling that the only finding a reasonable person, exercising impartial

9

judgment, could make was that the jury's award of $150,000.00 for past and future physical pain and suffering was abusively low. The undisputed testimony and evidence reveal that Susan suffered extreme pain as a result of the accident which caused her to undergo three surgeries. Additionally, she will likely need to undergo a future lumbar fusion. As such, we find that the trial court properly granted a JNOV on this element of damages.

### B.      Past and Future Mental Pain and Suffering

The jury in this matter failed to award damages for past and future mental pain and suffering. The trial court granted a JNOV and combined the amount awarded for mental pain and suffering with the amount awarded for physical pain and suffering. We find no error in the trial court's actions.

Dr. Gunderson's medical records dated July 17, 2009, indicates that Susan was "[s]tarting to feel depressed." He testified at trial that "[p]eople with long term chronic pain do get depressed" which he believed Susan was experiencing. Dr. Gunderson indicated that he referred her to Dr. Lawrence Dilks, a neuropsychologist, for an evaluation.

Medical records and testimony show that Dr. Dilks counseled Susan sixteen times for depression. In his September 13, 2011 medical report, Dr. Dilks indicated that Susan's depression caused her the "inability to function in an appropriate fashion." Dr. Dilks' trial testimony reveals that he performed two neuropsychological evaluations, which he explained uses different tests to look into the functioning of different parts of the brain "that may have been injured or well preserved following some form of an incident." The results, according to his testimony, were: "depression, anxiety, post-traumatic stress disorder, insomnia and sexual dysfunction." He stated that Susan also experienced memory loss, and

that her symptoms more likely than not arose from the accident. Dr. Dilks testified that he reviewed two reports prepared by Defendants' neuropsychological expert, Dr. Megan Ciota. There is nothing in the record indicating that Defendants produced Dr. Ciota as an expert at trial.

The evidence and testimony show that Susan, at a minimum, suffered from depression. It shows that she was more likely than not suffering from some form of mental anguish. As such, no reasonable person would fail to award anything. Thus, we find no error in the trial court's grant of a JNOV with respect to past and future mental pain and suffering.

### C. Loss of Enjoyment of Life

The jury in this matter did not award damages for loss of enjoyment of life. The trial court granted a JNOV as to this issue. Again, we find no error in the trial court's actions.

Loss of enjoyment of life is defined as "detrimental alterations of a person's life or lifestyle or the person's inability to participate in the activities or pleasures of life that were formerly enjoyed" before the injury. *McGee v. A C and S, Inc.*, 05-1036, p. 3 (La. 7/10/06), 933 So.2d 770, 773. Whether a person experiences "a detrimental lifestyle change depends on both the nature and severity of the injury and the lifestyle of the plaintiff prior to the injury." *McGee*, 933 So.2d at 775.

The testimony and medical evidence, including Maurice's testimony regarding their life together, reveal that Susan was physically active before the accident. Maurice stated that they produced and hosted an outdoors television program called Bayou Country Outdoors since 1995. Maurice indicated that Susan appeared in approximately 340 episodes of these half-hour hunting and fishing shows. He explained that Susan was known as "the fishing lady[.]" Maurice

11

testified that they hunted together approximately nine times per year for doves, teal, and pheasants. He revealed that they fished together approximately forty times per year. Maurice stated that after the accident, Susan could not hunt and fish at the same level she did pre-accident, she could not shoot a gun, and fishing became difficult for her.

Maurice's testimony is supported by Susan's testimony with respect to her pre-accident hunting and fishing capability. Susan indicated that post-accident, she no longer considers herself "the fishing lady[.]" She revealed that when people approach her to discuss fishing, she pulls away and gets Maurice to answer for her. In addition to fishing and hunting, Susan testified that she participated in other pre-accident activities, including: going out with friends; singing karaoke; dancing in high heels; gardening; washing her car; and running, which she averaged "probably about four to five miles a week." Susan testified that she no longer participates in those activities since the accident.

Medical records confirm Susan and Maurice's testimony regarding her post-accident limitations, including Dr. Gunderson's August 31, 2011 correspondence that Susan would not be "able to be involved shooting a shotgun, riding in a boat, or fishing with a rod and reel. Additionally, I do not believe that she can operate a shoulder mounted video camera, or a hand held video camera."

Accordingly, we find that the trial court was correct in granting Plaintiffs' Motion for JNOV and awarding damages with respect to loss of enjoyment of life. No reasonable person would find as the jury did in its judgment.

### D. Past Medical Expenses

In this matter, the jury awarded $235,500.00 for past medical expenses, which the trial court reduced to $235,417.90 on JNOV. In brief, Defendants

provide no argument regarding the trial court's alleged error with respect to past medical expenses. Thus, we decline to discuss past medical expenses in this regard.

### E.    Future Medical Expenses

In this matter, the jury awarded Susan $100,000.00 for future medical expenses, which the trial court increased on JNOV. Awards for future medical expenses were discussed in *Veazey v. State Farm Mutual Auto Insurance*, 587 So.2d 5, 8 (La.App. 3 Cir. 1991), as follows:

> Future medical expenses, like any other damages, must be established with some degree of certainty. The plaintiff must show that, more probably than not, these expenses will be incurred. Awards will not be made in the absence of medical testimony that they are indicated and setting out their probable cost. *Boothe v. New Orleans Public [Serv.], Inc.*, 447 So.2d 620 (La.App. 4 Cir.1984); *Sikes v. McLean Trucking Co.*, 383 So.2d 111 (La.App. 3 Cir.1980). An award for future medical expenses cannot be based on mere speculation of the jury. Much stronger proof, such as medical testimony of the specific expenses to arise, should be required for such an award. *Simmons v. Custom-Bilt Cabinet & Supply Co.*, 509 So.2d 663 (La.App. 3 Cir.1987); *Sikes*, supra.

Plaintiffs in this matter provided future medical damages, based in part upon Dr. Rubino's life care plan, which showed that Susan would require the following: lumbar MRIs; lumbar physical therapy; pool membership; lumbar epidural steroid injections; bilateral lower extremity EMG; a pain management physician; and a neurosurgeon. Dr. Rubino further opined that Susan would likely need to undergo a lumbar fusion, i.e., TLIF, in the future.

The present value of Dr. Rubino's life care plan was provided by Dr. Charles Bettinger, an expert economist, who opined that Susan's total future economic loss equated to $1,059,131.00. This amount encompassed $915,881.00 for Susan's ongoing medical needs and $143,250.00 for anticipated surgery and treatment, which included: TLIF; physical therapy; shoulder arthroscopy with rotator cuff

repair; chryotherapy; physical therapy; and brace. Susan underwent the shoulder surgery, which Dr. Bettinger opined would cost $28,768.00. As to the TLIF, Dr. Bettinger indicated it would cost $104,335.00. Dr. Perry, Defendants' expert, agreed that Susan would need a TLIP.

The medical testimony clearly set out the probable cost of future medical expense well above that which was granted in the JNOV. We, therefore, find no error in the trial court's grant of a JNOV on the issue of future medical expenses.

### F.     Loss of Consortium

The jury in this matter awarded Maurice $15,000.00 as damages for loss of consortium. The trial court granted a JNOV, increasing this amount. We find no error in the trial court's actions.

Loss of consortium damages were discussed in *Broussard v. Romero*, 96-973, p. 12 (La.App. 3 Cir. 2/26/97), 691 So.2d 1265, 1273, *writ denied*, 97-670 (La. 4/25/97), 692 So.2d 1092, as follows:

> The compensable elements of damage in a loss of consortium claim are loss of society, sex, service, and support. "Society" is broader than loss of sexual relations. It includes general love, companionship, and affection that the spouse loses as a result of the injury. "Support" is the lost family income that would go to support the uninjured spouse. "Service" is the uncompensated work around the house or educational help with the children which will, as a result of the injury, have to be obtained from another source and at some price.

In this case, Maurice testified that prior to the accident, he and Susan lived together, worked together, and spent much time hunting and fishing. They had sex one to two times per week. Maurice revealed that everything changed after the accident. He stated that their sex life dwindled and that Susan was irritable and experienced excruciating pain. Maurice noted that they no longer hunted and

14

fished together at the same level since Susan was unable to shoot a gun and fishing became difficult for her. Maurice revealed that he missed this time with Susan.

It is clear from the record that Maurice established loss of society and companionship. Defendants' contention that the trial court improperly granted JNOV with respect to loss of consortium is without merit.

## III. Quantum

Having determined that the trial court was correct in granting the JNOV, we must consider whether the amounts set by the trial court were proper. In that regard, we are guided by *Anderson*, 583 So.2d at 833, which provides:

> Once a trial court has concluded that a JNOV is warranted because reasonable men could not differ on the fact that the award was either abusively high or abusively low, it must then determine what is the proper amount of damages to be awarded. In making this determination, the judge is not constrained as the courts of appeal are to raising (or lowering) the award to the lowest (or highest) point which is reasonably within the discretion afforded the court. *Coco v. Winston Industries, Inc.*, 341 So.2d 332 (La.1976).

The *Anderson*, 583 So.2d at 834, court further stated that the trial court's amount awarded via JNOV is then "reviewed on appeal under the constraints of *Coco*, [341 So.2d 332]."

### A. Past and Future Physical and Mental Pain and Suffering

In this case, the trial court combined the jury's separate awards for past and future physical and mental pain and suffering and increased this general damage award to $450,000.00. The trial court's award was based upon medical evidence and testimony indicating that Susan was in excellent health prior to the accident. It showed that she sustained serious injuries which required three surgeries and that Susan would likely need to undergo a future lumbar fusion. The testimony and

15

evidence revealed that she became depressed, had a diminished quality of life, and would need future medical care and therapy.

This general damage award is less than the general damage award in *Cobb v. Delta Exports, Inc.*, 05-509 (La.App. 3 Cir. 12/30/05), 918 So.2d 1080, *writ denied*, 06-225 (La. 4/24/06), 926 So.2d 551, wherein the plaintiff driver collided with a front-end loader. This court affirmed the jury's award of $500,000.00 in general damages. *Id.* In determining the award, this court found that the collision resulted in the need for three surgeries, including a lumbar and cervical fusion. *Id.* We noted that although the plaintiff had some pain prior to the accident, his condition "significantly worsened afterward resulting in the inability to return to employment." *Id.* at 1090.

Defendants contend that the increased general damage award is improper because Susan's subjective pain complaints are highly suspect. However, her subjective pain complaints as being high on a scale from one to ten were supported by physician testimony and other objective evidence, showing that Susan suffered from accident-related injuries and was being truthful. Specifically, Dr. Gunderson testified that some patients rate their pain higher simply because they have not experienced pain to the degree that Dr. Gunderson has seen experienced by some of his other patients. Dr. Gunderson noted in his August 31, 2011 correspondence that Susan's subjective lower back complaints corroborated with the objective evidence, i.e., the MRIs of her lumbar spine taken on August 7, 2009 and April 16, 2010.

Other objective evidence corroborating Susan's subjective shoulder complaints includes Dr. Cascio's April 24, 2013 correspondence wherein he stated: "MRI and physical exam are consistent with a superior labrum tear and rotator cuff

tear." He noted therein that: "The rotator cuff tear that was seen at the time of surgery demonstrated evidence that it was caused by a traumatic injury." Dr. Rubino, likewise, corroborated Susan's subjective complaints with objective evidence given his testimony that his cervical fusion recommendation was based upon Susan's MRI results.

Dr. Cascio testified that he found Susan reliable and agreed that her complaints were correlated by the objective findings. Dr. Gunderson testified that Susan was reliable, believable, and consistent. Dr. Rubino testified that "[a]s the days went on and as the visits went on. I think she was very reliable. She was honest." Dr. Dilks' testimony indicates that he agreed Susan was in pain based upon his testing and clinical sessions. Thus, Defendants' argument is without merit.

Defendants further contend that Susan's failure to advise her physicians of her post-accident casino trips indicates that she misled her physicians with respect to pain. The objective evidence and physician testimony, however, refute Defendants' claim. Specifically, Dr. Gunderson testified that going to the casino would "[p]robably [be] less demanding" than going to the doctor or library. Dr. Rubino testified that: "For going to a casino and sitting there and pulling a slot machine, anybody can do that, including a disabled." Defendants' argument, therefore, is without merit.

Accordingly, after a thorough review of the medical evidence presented above, we find that the medical testimony and records provide a reasonable basis for the trial court to award $450,000.00 to Susan for past and future mental and physical pain and suffering. As such, we affirm the trial court's award.

## B. Loss of Enjoyment of Life

In this matter, the trial court awarded $100,000.00 for loss of enjoyment of life. This award was based upon medical evidence and testimony indicating that Susan was in good health and physically active pre-accident. The testimony revealed that Susan participated in the following before the collision: fishing; hunting; going out with friends; and running. Following the accident, her physical ability and quality of life diminished.

As to the amount the trial court awarded in this case, we look to factually similar cases. In *Godchaux v. Peerless Insurance Co.*, 13-1083 (La.App. 3 Cir. 6/4/14), 140 So.3d 817, *writ denied*, 14-1411 (La. 10/3/14), 149 So.3d 801, this court increased the trial court's award for loss of enjoyment of life from $0.00 to $50,000.00. We noted:

> Here, it is clear that Mr. Godchaux has suffered detrimental alterations to his lifestyle as a result of his injuries. He suffers from continued pain, fatigue, and can no longer participate in many social activities he loves, such as hunting and fishing. Furthermore, his marriage and sex life have suffered greatly. Finally, he was forced to give up his career as an on-duty police officer.

*Id*. at 826-27.

Similarly, in *Savant v. Hobby Lobby Stores, Inc.*, 12-447 (La.App. 3 Cir. 11/7/12), 104 So.3d 567, we affirmed the trial court's grant of JNOV awarding $100,000.00 in damages for loss of enjoyment of life. This court held: "The jury heard ample testimony regarding Ms. Savant's limitations. She was an active individual until the accident. Following the accident, she could no longer participate in a host of activities that brought her pleasure." *Id*. at 573.

Accordingly, after reviewing the medical evidence presented above, we find that the medical testimony and records provide a reasonable basis for the trial court

to award $100,000.00 for loss of enjoyment of life. We affirm the trial court's judgment on this issue.

### C.    Future Medical Expenses

In this matter, the trial court awarded $240,000.00 for future medical expenses. An award of special damages is reviewed utilizing the manifest error standard of review, unlike a general damage award which is reviewed utilizing the abuse of discretion standard. *Reed v. LaCombe*, 15-120 (La.App. 3 Cir. 7/29/15), 172 So.3d 679.

The trial court's award in this matter was based upon medical evidence and testimony showing that Susan was healthy and active pre-accident. The record shows that her health declined following the accident such that future medical expenses will be necessary. Plaintiffs proved so strongly that reasonable persons could not deny that Susan will need future lumbar MRIs; lumbar physical therapy; a pool membership; lumbar epidural steroid injections; a bilateral lower extremity EMG; a pain management physician; and a neurosurgeon. Dr. Rubino opined that Susan would probably need a future lumbar fusion. Dr. Bettinger opined that Susan's total future economic loss equated to $1,059,131.00. Accordingly, the trial court was not manifestly erroneous in increasing the jury's award from $100,000.00 to $240,000.00. The trial court's judgment is affirmed in this regard.

### D.    Loss of Consortium

In this case, the trial court awarded Maurice $50,000.00 for loss of consortium. The trial court's award was based upon medical evidence and testimony indicating that Susan's superior health prior to the accident enabled her to work, fish, hunt, and become intimate with him. Her ability to participate in those activities diminished since the accident.

To determine whether the trial court's award was proper, we look to factually similar jurisprudence. In *Maddox v. City of Oakdale*, 99-726 (La.App. 3 Cir. 11/3/99), 746 So.2d 764, *writ denied*, 99-3388 (La. 2/11/00), 754 So.2d 936, the trial court awarded $75,000.00 for loss of consortium. The trial court considered the fact that the plaintiff underwent rotator cuff surgery as a result of the accident.

Accordingly, after a thorough review of the medical evidence presented above, we find that the medical testimony and records provide a reasonable basis for the trial court to award $50,000.00 to Maurice for loss of consortium. The trial court did not abuse its discretion in this regard.

## CONCLUSION

The trial court's judgment in favor of Plaintiffs/Appellees, Maurice Fontenot and Susan Melton Fontenot, is affirmed. All costs of this appeal are assessed to Defendants/Appellants, Jarred Levar Stevens, Carl's Rentals, and Republic Fire and Casualty Insurance Company.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.

20